**UNITED STATES, Appellee,**

v.

**Sergeant James T. MURPHY, 238–25–4374, United States Army, Appellant.**

**ACMR 8702873.**

U.S. Army Court of Military Review.

25 May 1990.

For Appellant: Captain Timothy P. Riley, JAGC (argued), Colonel Robert B. Kirby, JAGC, Lieutenant Colonel Russell S. Estey, JAGC, Major Marion E. Winter, JAGC (on brief).

For Appellee: Captain Jonathan F. Potter, JAGC (argued), Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Gary L. Hausken, JAGC, Captain Randy V. Cargill, JAGC, Captain Patrick D. O'Hare, JAGC (on brief).

Before the Court Sitting En Banc.

## OPINION OF THE COURT

FOREMAN, Senior Judge:

A general court-martial convicted the appellant of three specifications of premeditated murder, larceny, bigamy, and false swearing in violation of Articles 118, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 934 (1982) [hereinafter UCMJ]. The court sentenced the appellant to forfeit all pay and allowances, to be reduced to Private El, and to be put to death. The convening authority approved the sentence. The case is before this court for mandatory review pursuant to UCMJ art. 66(b)(1), 10 U.S.C. § 866(b)(1) (1982).

The victims were the appellant's former wife, Petra Murphy, Petra's five-year-old son by a former marriage, Tim A. Herkstroeter, and the appellant's twenty-one-month-old son by Petra Murphy, James. They were killed at some time prior to the appellant's departure from Germany on 20 August 1987, pursuant to orders reassigning him to Redstone Arsenal, Alabama.

The appellant married Beate Murphy on 12 June 1987, without benefit of a divorce from Petra Murphy; thus, the bigamy conviction. Although an acrimonious divorce proceeding was pending in the German courts, the appellant filed for a divorce from Petra Murphy in Sampson County, North Carolina. The North Carolina court entered a decree of divorce on 22 July 1987, based on Petra Murphy and the appellant living apart for more than one year.

Petra Murphy was last seen alive by Private First Class (PFC) Carlos Ruddy, a church acquaintance, on the afternoon of Sunday, 16 August 1987. Because Petra Murphy did not own an automobile, PFC Ruddy had given her a ride to the local post exchange and then carried groceries up to her apartment. On Monday, 17 August, Mrs. Kathy Swift, also a church friend, took her two children to Petra Murphy's apartment so that Petra could baby-sit the children. Although Petra was usually very reliable, there was no answer when Mrs. Swift knocked on the door. Mrs. Swift became concerned and checked at the kindergarten Tim attended and found that Tim was absent. Chief Warrant Officer Two (CW2) Betram Smith, Petra's pastor, became concerned after Petra missed several church activities, because she always called when she could not attend. CW2 Smith went to the apartment on Wednesday and again on Thursday or Friday but no one answered the door. He visited the apartment again on Sunday, 23 August, after Petra missed church services. He noticed an odor coming from the kitchen window and notified the German police.

The German police entered the apartment through a window. In the bathroom, they discovered the dead bodies of Petra, Tim and James. The bodies of the children lay in a partially filled bathtub. Tim was lying face up, James face down. Petra was in a kneeling position beside the tub, her head draped into the water.

Professor Doctor Hans Fredrick Brettel, a forensic pathologist, testified that Petra died by drowning; however, she had also suffered at least four severe blows to the head prior to death. One blow fractured

her skull. Dr. Brettel testified that Petra may have been unconscious at the time that her head was submerged, but he could not be certain. He detected injuries indicative of choking on her neck. There were no defensive injuries on her hands or legs.

Dr. Brettel's examination of the bodies of the children revealed that both had died from drowning. He opined that the children were alive and conscious at the time of drowning. There was no evidence of any other physical injuries.

On 27 August 1987, Special Agent (SA) Charles F. Woodall of the United States Army Criminal Investigation Command (CID) interviewed the appellant at the CID office at Redstone Arsenal, Alabama, the appellant's new duty station. The appellant waived his UCMJ article 31 rights.[1] Initially, the appellant denied all knowledge of the murders and denied having been at Petra's apartment. On further questioning, the appellant admitted that he had been at Petra's apartment on the day of the murders, but insisted that he had not harmed the children. He did, however, admit that he had killed Petra: "[w]hat would you say if I told you that I killed her because she killed the children?"

The appellant stated that he had gone to the apartment to say good-bye. He and Petra argued when the appellant told her that he wanted custody of the children. According to the appellant, Petra took the children to the bathroom for a bath and returned ten or fifteen minutes later and announced that the appellant could not take them because they were dead. In this version of events, the appellant killed Petra because she had killed the children.

The appellant stated that he choked Petra but fled when she obtained a knife from the kitchen. He went to his car, put on gloves, and returned to the apartment carrying a mason's hammer. The appellant said that he returned to the apartment, asked Petra why she had killed the chil-

dren, and hit her with the hammer only after she came at him with the knife. "I just stood there for a couple of minutes stunned. I could not believe what had happened and was stunned." The appellant rearranged the crime scene to make it look "like someone had broken in." He departed, taking Petra's car keys, her military identification card, and the knife she allegedly used to assault him. The appellant revealed how and where he had disposed of the keys, identification card and knife, but stated that the hammer and gloves were still in the trunk of his car. This statement was reduced to writing, sworn and signed by the appellant. The appellant also drew a detailed diagram of the bathroom correctly identifying the positions of the bodies.

SA Woodall then told the appellant that he did not entirely believe the appellant's rendition of events. The appellant responded: "[w]hat would you say if I told you that I killed one of the children and Petra killed the other one?" The appellant then stated that he had killed Petra and Tim in retaliation for Petra killing James. This oral statement was not reduced to writing. SA Woodall again advised the appellant that he did not believe him because the CID investigation had revealed that James had been killed first. The appellant then gave a third version, which was reduced to writing.

In this version, the appellant stated that most of his earlier accounts were true but that, "[t]he only portion I need to change is that part that pertains to what happened after I arrived at PETRA'S house." In this version, he and Petra were physically fighting when he began choking Petra. Tim attempted to interpose himself between the two and the appellant knocked him away. "I did not mean to hurt him but when I looked I saw that he was laying still on the floor and that his tounge [sic] was sticking out and there was blood coming

---

1. UCMJ art. 31(b), 10 U.S.C. § 831(b) (1982), provides that "[n]o person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him' in a court-martial."

from his mouth." Alarmed, the appellant "quit choking Petra." She went to the kitchen and returned with a knife. The appellant ran to his car for his gloves and hammer. When he returned, Petra attacked him and he bludgeoned her with the hammer. The appellant explained:

I was stunned so I went to the bathroom and filled the tub with water. I then went and got Tim and placed him face up in the water and walked away. I then went to the bedroom where James was sleeping and got him. This woke him up a little and I carried him and placed him in the tub. I sat him down and held his face under water about five seconds but then realized that I could not kill my son so I allowed him to come up. I then walked away and I heard him coughing and assumed he was okay. I then went and got PETRA and placed her over the tub as previously stated. At that time I saw that James was not moving and was laying [sic] in the water but I saw that his face was out of the water. I did not check him.

According to the appellant, he then left the apartment.

This was the final written form of the appellant's statement. At the conclusion of the interview, SA Woodall asked the appellant why he had killed James, his own son. The appellant explained that he killed James because the authorities would "automatically assume" that he was the perpetrator if James survived.

While in the Mannheim Confinement Facility, the appellant also confessed his guilt to two fellow inmates, Steve Offill and Private Michael French. The appellant told both Offill and French he wanted to take the blame fully and wanted to avoid implicating his present wife, Beate Murphy. The appellant's confessions to Offill and French were consistent with his final written statement to SA Woodall.

French testified that the appellant stated, after recounting events up to the point where Petra lost consciousness, that "he said it was like a voice that was in his mind, telling him to '[g]o get your other son because he knows you were there as a

witness.'" In French's recollection of this version, the appellant likewise released James when he began to struggle and "went back into the living room and got his wife that was unconscious and his son that was unconscious and took them into the bathroom and placed them both face down into the bathtub ... Then he left." The appellant told French that this version "protected someone he loved."

In an admission to Sergeant First Class James R. Marek, the appellant stated that he had gone to say good-bye to his son but that Petra had met him at the top of the stairs with a knife. He retreated, got the hammer from the car, and confronted Petra. In this version, Tim interferes and is injured. In an ensuing struggle between the appellant and Petra, the appellant falls on Tim and breaks his ribs. Petra is thereafter injured. When the appellant sees both of them lying on the floor unconscious, he acts to "cover up" his misconduct by drowning his son.

The appellant has alleged errors in the pretrial processing of his case, the admission of evidence on the merits, the procedural instructions for voting on findings, the validity of the death penalty procedures prescribed in the Manual for Courts-Martial, and the admissibility of evidence during the sentencing hearing.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The appellant contends that he was denied effective assistance of counsel at a critical stage of the proceedings due to an erroneous interpretation of the Logan Act, 18 U.S.C. § 953 (1982), and US Army Europe Regulation 550–56: Foreign Countries and Nationals, Exercise of Jurisdiction by Federal Republic of Germany Courts and Authorities Over U.S. Personnel, para. 4 (11 Oct. 1983 and C. 1, 16 Oct. 1986). The Logan Act prohibits unauthorized negotiation with a foreign government. The US Army Europe Regulation designates certain military officials as the points of contact with judicial officials of the Federal Republic of Germany and its political subdivisions. In appellant's case, the Federal

Republic of Germany declined to exercise criminal jurisdiction, in accordance with existing Status of Forces Agreements.[2] The appellant's counsel decided, after personal research and consultation with other military lawyers, that he was prohibited from attempting to persuade the German authorities to exercise jurisdiction. The appellant now argues that his trial defense counsel's failure to negotiate with the Federal Republic of Germany, which does not allow capital punishment, denied him effective assistance of counsel. We disagree for two reasons.

First, an accused has no right to participate in the decision among sovereign nations to exercise jurisdiction. Rule for Courts–Martial 201(d)[3] [hereinafter R.C.M.] provides that such a decision "is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused." Rule for Courts–Martial 201(d) is based on *Girard v. Wilson*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544 (1957), and embodies the long-established principle that an accused lacks standing to challenge the decision regarding which sovereign will exercise jurisdiction over him unless such a decision denies him a fair trial. *Ponzi v. Fessenden*, 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607 (1922). *Accord United States v. Evans*, 6 M.J. 577, 580 (A.C.M.R. 1978), *pet. denied*, 6 M.J. 239 (C.M.A.1979); R.C.M. 201(d) analysis at A21-8. Since the appellant had no right to participate in the decision regarding which sovereign would exercise jurisdiction, he had no right to representation by counsel regarding that decision.

Second, the determination whether criminal jurisdiction would be exercised by the United States or the Federal Republic of Germany was not a "criminal proceeding." An extradition proceeding between States is not a critical stage of crimi-

nal prosecution requiring counsel. *United States ex rel. Calhoun v. Twomey*, 454 F.2d 326 (7th Cir.1971). Likewise, international extradition proceedings conducted pursuant to treaty are not criminal proceedings. *Sahagian v. United States*, 864 F.2d 509 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir.1976), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98, *reh'g denied*, 429 U.S. 988, 97 S.Ct. 511, 50 L.Ed.2d 600 (1976). We hold that the waiver/recall decision by the Federal Republic of Germany is analogous to an extradition decision, and as such is not a criminal proceeding for the purposes of the sixth amendment right to counsel. We find that the assignment of error is without merit.

## II. JURISDICTION

[5] The appellant contends that the court-martial lacked *in personam* jurisdiction over him because he was attached to the wrong unit upon his return from Redstone Arsenal to the 3d Armored Division. We find this contention without merit.

On 28 August 1987, the Commander of the 3d Armored Division requested that the Commander of Redstone Arsenal return the appellant to Germany for trial. The Commander of Redstone Arsenal complied. On 9 September 1987, the Commander of the 3d Armored Division requested the concurrence of the Commander of Redstone Arsenal in the attachment of the appellant to Headquarters and Headquarters Company, 3d Armored Division, and the Commander of Redstone Arsenal again complied. On 29 October 1987, the appellant was attached to the 56th Repair Parts Company, his former unit, instead of Headquarters and Headquarters Company. Although the 56th Repair Parts Company is a subordinate unit of the 3d Armored Divi-

**2.** Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces of June 19, 1951 (NATO Status of Forces Agreement), Aug. 23, 1953, 2 U.S.T. 1792, T.I.A.S. No. 2846, 199 U.N.T.S. 67, and Agreement to Supplement the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces with Respect to Foreign Forces Stationed in the Federal Republic of Germany, *opened for signature,* Aug. 3, 1959, art. 19, para. 3, 14 U.S.T. 531, T.I.A.S. No. 5351, at 23.

**3.** Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 201(d) [hereinafter R.C.M.].

sion, it is not an element of Headquarters and Headquarters Company.

Army Regulation 27–10, Legal Services: Military Justice, para. 5–36 (10 July 1977) [hereinafter AR 27–10], provides that personnel may be attached for court-martial jurisdiction to a unit other than their parent unit, but that the general court-martial convening authorities of both the parent unit and the unit of attachment must concur. The appellant argues that the Commander of Redstone Arsenal concurred in his attachment to Headquarters and Headquarters Company, 3d Armored Division, but not to the 56th Repair Parts Company, and that the failure to comply with AR 27–10 deprived the court-martial of jurisdiction. We find to the contrary.

■ A properly constituted court-martial may try any person subject to the Uniform Code of Military Justice, even if the accused is not under the command of the convening authority. UCMJ articles 21, 22, 10 U.S.C. §§ 821, 822 (1982); *United States v. Jones*, 15 M.J. 890 (A.C.M.R.1983). Although a commander's power to convene courts-martial may be withdrawn or limited by higher authority, Army Regulation 27–10 did not deprive the Commander of the 3d Armored Division of jurisdiction over the appellant.

Paragraph 5–36 of Army Regulation 27–10 was designed to avoid conflicts of authority by ensuring that the parent unit had agreed to relinquish jurisdiction before a unit of attachment exercised jurisdiction. Conversely, it prohibits a unit from forcing jurisdiction on a unit that does not want it. Clearly, Redstone Arsenal relinquished jurisdiction in this case. Army Regulation 27–10 did not prohibit the receiving general court-martial convening authority from further attaching the appellant to another subordinate unit. We hold that the two general courts-martial convening authorities involved in appellant's case complied with Army Regulation 27–10, and the court-martial had *in personam* jurisdiction over the appellant.

4. UCMJ art. 32, 10 U.S.C. § 832 (1982).

## III. ARTICLE 32 INVESTIGATION

■ The appellant contends that the military judge erred by denying his request for a new Article 32 investigation. Article 32 of the Uniform Code of Military Justice provides that "[n]o charge or specification may be referred to a general courtmartial for trial until a thorough and impartial investigation of all the matters set forth therein has been made."[4] The appellant contends that the investigation of the charges against him was not impartial because the investigating officer received legal advice from a judge advocate who engaged in unauthorized communications with a prosecutor out of the presence of the appellant and his counsel.

Prior to commencement of the investigation, the appellant requested a verbatim transcript of the proceedings. The investigating officer sought legal advice from Major W. The policy of the 3d Armored Division was to require the approval of the Chief of Criminal Law for verbatim transcripts of Article 32 investigations. Major W told the investigating officer that he would ask Major S, the Chief of Criminal Law, to approve a verbatim transcript. Major S responded that he would not because of the heavy workload of the division court reporters, who worked under Major S's supervision. Major W advised the investigating officer of the division policy and of Major S's decision. The investigating officer then disapproved the request for a verbatim transcript; however, he permitted the appellant to tape record the proceedings and to retain the tapes for use at any subsequent trial.

The communication between Major W and Major S was purely administrative and did not involve substantive legal advice. The communication did not touch upon any matter reserved to the impartial discretion of the investigating officer. The assigned error is without merit.

## IV. ADMISSIBILITY OF THE PHOTOGRAPHS

■ The military judge admitted the following photographs of the crime scene:

Prosecution Exhibit 19—a view from the entrance to the bathroom, showing only Petra's lower body and feet;

Prosecution Exhibit 20—a view of all three bodies in the bathtub as they were found including blood droplets on the edge of the bathtub;

Prosecution Exhibit 21—a view of the bodies of Petra and Tim in the bathtub with Petra's body draped over Tim's;

Prosecution Exhibit 22—a full-body front view of Petra's body removed from the bathtub;

Prosecution Exhibit 23—the same view as Prosecution Exhibit 22 but with a close-up of the head and face;

Prosecution Exhibit 24—a view of the bodies of Tim and James in the bathtub after Petra's body was removed showing Tim's face up and James' face down;

Prosecution Exhibit 25—a close-up view of James' body face down in the bathtub;

Prosecution Exhibit 26—a view of James' body removed from the bathtub;

Prosecution Exhibit 27—a view of Tim's body face up in the bathtub after Petra's and James' were removed;

Prosecution Exhibit 28—a view of Tim's body removed from the bathtub;

Prosecution Exhibit 29—same view as Prosecution Exhibit 28 from a different angle.

The appellant contends that seven of the photographs, Prosecution Exhibits 21 through 25, 28, and 29, were erroneously admitted into evidence because they were unnecessary and so gruesome that their prejudicial impact outweighed their probative value. Because the bodies had been submerged in the bathtub for approximately one week, all of the photographs are gruesome, especially Prosecution Exhibits 22 and 23, which show Petra's swollen face and bulging eyes.

In determining the merits of the appellant's contention, we must consider whether the photographs were relevant; whether their prejudicial impact outweighed their probative value; and whether their admission impermissibly affected the sentence.

In this case, the appellant made four inconsistent statements and the prosecution intended to prove that the fourth statement, amounting to a complete confession, was the most truthful version. Consequently, it was essential to corroborate the appellant's description of the details of the crime. Prosecution Exhibits 19, 20, 21, 24, 25, and 27 corroborate the fourth statement by showing that the bodies were in the precise positions described by the appellant. Prosecution Exhibits 22 and 23 corroborate the appellant's admission that he struck Petra in the forehead with a hammer by showing the gaping wound in her forehead. Although the identity of the victims was not a contested fact, the prosecution was nevertheless required to prove that the victims were the persons named in the specifications. Mr. Horst Herkstroeter used Prosecution Exhibits 23, 28, and 29 to identify the bodies as those of Petra, his sister, and Tim and James, his nephews. The prosecution also was required to prove that the deaths occurred prior to the appellant's departure from Germany on 20 August 1987. The forensic pathologist used Prosecution Exhibit 23 to explain his opinion, based on the degree of decomposition, that death occurred "several days" prior to 23 August when the bodies were discovered.

Photographs which are relevant may be excluded if their probative value is substantially outweighed by their prejudicial impact. Manual for Courts-Martial, United States, 1984, Military Rules of Evidence 402 and 403 [hereinafter Mil.R. Evid.]. Gory or revolting photographs may be admissible to show how a crime was committed. *United States v. Montgomery*, 5 M.J. 832, 834 (A.C.M.R.), *pet. denied*, 6 M.J. 89 (C.M.A.1978). *See Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), *cert. denied*, 474 U.S. 1038, 106 S.Ct. 606, 88 L.Ed.2d 584 (1985), *reh'g denied*, 475 U.S. 1040, 106 S.Ct. 1252, 89 L.Ed.2d 359 (1986); *Fleenor v. State*, 514 N.E.2d 80 (Ind.1987), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). The critical question is whether the photographs were used "to persuade by illegit-

imate means." *United States v. White,* 23 M.J. 84, 88 (C.M.A.1986) (quoting *State v. Holland,* 346 N.W.2d 302, 309 (S.D.1984)). The prosecution is not required to sanitize a brutal killing. As the Court of Military Appeals has observed, "appellant has no right to claim that, because of the gruesomeness of his crime, the trier of fact may not consider evidence as to how the crime was committed." *United States v. Matthews,* 16 M.J. 354, 363 (C.M.A.1983).

In this case, the photographs were gruesome because they illustrate appellant's method of killing, that is, by drowning, leaving his victims partially submerged in the bathtub, and concealing the crime until he could leave Germany. We find that the photographs were highly probative. The military judge limited the prosecutor's use of the photographs to prevent inflammatory impact.[5] We find that Prosecution Exhibits 22 and 23, although gruesome, are also highly probative in demonstrating the method of killing, identity of the victim, and time of death. Once those two photographs were properly before the court, the others were bland by comparison. Some of the photographs, Prosecution Exhibits 19, 22, 25, and 29, were arguably cumulative, but they had no inflammatory impact once the others were properly admitted. We hold that the military judge did not abuse his discretion by admitting the photographs during the case on the merits.

 Having concluded that the photographs were admissible on the merits, we now turn to the question whether they, nevertheless, might have been unduly inflammatory on sentencing and thereby caused the court members to impose the death penalty in an arbitrary and capricious fashion in violation of the eighth amendment of the Constitution. The Supreme Court has not yet required a separate analysis, for sentencing purposes, of

evidence properly admitted on the merits. *See Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 2722, 101 L.Ed.2d 702 (1988) (Scalia, J., dissenting). Nevertheless, federal courts routinely have analyzed potentially inflammatory evidence for both admissibility on the merits and compliance with the eighth amendment. *See, e.g., Coleman v. Saffle,* 869 F.2d 1377, 1390 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1989) and, *reh. denied,* —— U.S.——, 110 S.Ct. 2606, 110 L.Ed.2d 285 (1990) (photographs of victim properly admitted on the merits did not violate eighth amendment); *Brogdon v. Butler,* 824 F.2d 338, 341 (5th Cir.), *cert. denied,* 483 U.S. 1040, 108 S.Ct. 13, 97 L.Ed.2d 802 (1987) (introduction of inflammatory photographs accurately depicting facts of crime did not violate eighth amendment).

In the case at bar, the photographs were admissible on the merits to establish the facts of the crime. Prosecution Exhibits 22 and 23, the two most gruesome, were highly probative to establish that the murder "was preceded by the intentional infliction of substantial physical harm," an aggravating factor under Rule for Courts–Martial 1004(c)(7)(I). The photographs were not emphasized during the sentencing argument. To the contrary, the prosecutor used photographs of the victims alive during his sentencing argument. Accordingly, we conclude that the photographs were not unduly inflammatory on sentencing and did not violate the eighth amendment.

## V. HEARSAY STATEMENTS OF BEATE MURPHY

The appellant contends that the military judge erred by permitting a German policeman, Investigator Dieter Feik, to testify regarding statements made by Beate Murphy. In an Article 39(a) session,[6] the trial

---

5. For example, after the photographs were identified, the military judge stopped the prosecutor's attempt to have a second German policeman testify about the same photographs. After findings, the military judge excluded a photograph of the children, while they were alive, in the same bathtub where they were later drowned.

6. UCMJ art. 39(a), 10 U.S.C. § 839 (1982). Article 39(a) authorizes "pretrial and other hearings without the presence of the members concerning those matters which are amenable to disposition on either a tentative or final basis by the military judge." See R.C.M. 803 discussion.

counsel announced that he had intended to call Beate Murphy as a government witness but had been advised that she would refuse to testify against her husband, the appellant. The trial defense counsel confirmed that Beate Murphy would invoke her spousal privilege under Mil.R.Evid. 504 and refuse to testify.

The military judge found that, notwithstanding the unresolved issue of the appellant's bigamous marriage, Beate Murphy was the appellant's wife for the purposes of the husband-wife privilege in Military Rule of Evidence 504. He also found that Beate Murphy was unavailable within the meaning of Military Rule of Evidence 804. The trial defense counsel did not contest Beate Murphy's unavailability, but objected to the admission of her statement to Investigator Feik on the ground that it lacked the circumstantial guarantees of trustworthiness required by Military Rule of Evidence 804(b)(5).

After Investigator Feik testified regarding the circumstances of Beate Murphy's statement, the military judge overruled the defense objection and found that Beate Murphy's statement was sufficiently trustworthy to warrant admission. His ruling was based on his findings that Investigator Feik had advised Beate Murphy of her rights under German law, had told her that her husband was a suspect, that she was a witness, and that she was subject to a penalty if she made a false statement or falsely implicated anyone in a crime. The military judge did not specifically find that the factual matters contained in the hearsay declarations were "material facts" nor did he specifically find that the hearsay evidence was more probative than any other evidence reasonably available to the prosecution.

Investigator Feik was allowed to testify that Beate Murphy informed him that the appellant was absent from their apartment from about 2100 hours on 16 August until 0500 on the morning of 17 August 1987. Beate Murphy also told Investigator Feik that the appellant was driving her yellow Opel, which was later seized and found to contain gloves and a hammer matching those described by the appellant in his multiple confessions.

The military judge observed that "the accused, pursuant to Rule 504, may exercise the spousal privilege against having a spouse testify against him," and found that the appellant had caused Beate Murphy's unavailability by invoking that right. We agree with the military judge's finding that Beate Murphy was "unavailable" within the meaning of Military Rule of Evidence 804, but we hold that the military judge erred by finding that the appellant's invocation of the husband-wife privilege caused Beate Murphy's unavailability.

The husband-wife privilege actually consists of two distinct privileges: spousal incapacity and confidential interspousal communications. The privilege of spousal incapacity affords the testifying spouse an almost absolute right to refuse to testify against his or her spouse. Mil.R. Evid. 504(a); *but see* Mil.R.Evid. 504(c)(2) (exceptions to spousal incapacity). This privilege lies solely with the testifying spouse and may not be invoked by the accused; it extends even to operative facts and may be invoked without regard to the wishes of the accused. S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 438 (2d ed. 1986) [hereinafter Saltzburg]. The privilege of confidential interspousal communications entitles the spouse who discloses a confidentiality to the other spouse to shut the mouth of the other. Mil.R.Evid. 504(b)(3). The key element of this privilege is confidential communication.

The matters to which Investigator Feik would have testified do not qualify as confidential communications. The fact that the appellant was away from the marital dwelling is not a communication, nor is it a "communicative act." *See United States v. Martel*, 19 M.J. 917 (A.C.M.R.1985); *see generally United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (communicative acts). Even if we ascribe some communicative quality to the appellant's conduct, his driving a yellow Opel on open roads is not "confidential" but a public act. Consequently, neither the appellant

nor Beate Murphy were entitled to claim the confidential communication privilege under Military Rule of Evidence 504(b).

However, the question of spousal incapacity remains. Neither party called Beate Murphy into court and elicited an affirmative invocation of the privilege of spousal incapacity under Military Rule of Evidence 504(a). The privilege is personal to the testifying spouse. Neither the accused nor the government were entitled to claim this personal privilege on Beate Murphy's behalf. *See* Saltzburg, at 438.

 However, in the case at bar both parties agreed that Beate Murphy would invoke spousal incapacity if called as a witness. This agreement, accepted at face value by the military judge, was tantamount to an oral stipulation of fact, which is permitted by Rules for Court–Martial 811(a). *See United States v. Jenkins*, 28 M.J. 808, 809 (A.C.M.R.1989); *see also United States v. Cambridge*, 12 C.M.R. 133, 138 (C.M.A.1953). Beate Murphy's invocation of spousal incapacity, an invocation which neither the appellant nor the government could overcome, rendered her unavailable for confrontation purposes. *Cf. United States v. Koistinen*, 27 M.J. 279 (C.M.A.1988) (invocation of the privilege against self-incrimination renders the witness unavailable). Because the parties stipulated that Beate Murphy would invoke spousal incapacity, there was no need to formally call her into court for the sole purpose of invoking the privilege. We find that the military judge properly excused her from testifying. *See* Mil.R.Evid. 804(a)(1). Having determined that the military judge correctly found that Beate Murphy was unavailable, albeit for the wrong reasons, we turn to the question whether her statements were admissible under the residual hearsay rule, Military Rule of Evidence 804(b)(5).[7]

The residual hearsay exceptions are intended to "be used very rarely and only in exceptional circumstances," and "all pre-requisites for use of the residual exception must be satisfied, unless they are waived by the party against whom the statement is being introduced." *United States v. Guaglione*, 27 M.J. 268, 274 (C.M.A.1988). This includes the requirement for "equivalent circumstantial guarantees of trustworthiness." Beate Murphy's unavailability determines which standard the government must meet in order to qualify her hearsay statements for admission under the residual hearsay rule.

 When a declarant is available, there is no confrontation issue, *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), and the government need only satisfy the purely evidentiary standard of "equivalent circumstantial guarantees of trustworthiness." Mil. R.Evid. 803(24). However, when a declarant is unavailable, the government's burden is heavier.

> [T]o the extent *ex parte* interviews are tendered as substitutes for the right of confrontation, they must be shown to have been taken under such circumstances as to effectively assure that confrontation values have been satisfied.

*United States v. Barror*, 23 M.J. 370, 372 (C.M.A.1987). In the absence of opportunity for face-to-face confrontation, "it is essential that the statements bear 'indicia of reliability' such that 'there is no material departure from the reason of the general rule'" requiring confrontation. *United States v. Hines*, 23 M.J. 125, 131 (C.M.A. 1986); *accord Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

In the case at bar, we find the circumstances of Beate Murphy's statement inadequate to satisfy the requirement for "equivalent circumstantial guarantees of trustworthiness." Furthermore, her statement is encumbered with two factors which affirmatively detract from trustworthiness: it was not made under oath and it was made to a law enforcement official in the

---

**7.** Whether the appellant's bigamous "marriage" to Beate Murphy was validated after his divorce from Petra Murphy was not resolved on the record. However, since both parties agreed that Beate Murphy was the appellant's "spouse," and the military judge accepted that agreement, we are treating the existence of a valid marriage between appellant and Beate Murphy at the time of appellant's trial as a stipulated fact. Rules for Court–Martial 811(a).

course of a criminal investigation, a circumstance viewed with judicial suspicion.

■ Criminal investigators " 'are not merely observing and evaluating but are seeking to build a case to prove guilt.' " *United States v. Guaglione,* 27 M.J. at 274 (quoting *United States v. Cordero,* 22 M.J. 216, 223 (C.M.A.1986)). *See also United States v. Hines,* 23 M.J. at 137. Consequently, out-of-court declarations to criminal investigators are particularly suspect because they may be the product of the investigator's input. *Id.* The Court of Military Appeals has not held that such statements are inadmissible *per se. See, e.g., United States v. Powell,* 22 M.J. 141 (C.M. A.1986). However, the burden of admitting out-of-court statements to law enforcement officials is significantly higher. *Cf. United States v. Barror,* 23 M.J. 370, 372 (C.M.A.1987) (where the declarant was unavailable, the proponent was required to demonstrate that the statements were not influenced by the investigatory process in addition to demonstrating some indicia of reliability and circumstantial guarantees of trustworthiness).

■ Nevertheless, the error is harmless. Applying the analysis prescribed in *United States v. Weeks,* 20 M.J. 22, 25 (C.M.A.1985), *on remand,* 21 M.J. 1025 (N.M.C.M.R.1986), we find that the government's case against the appellant was strong and conclusive in light of the appellant's multiple confessions. The identity of the appellant as the perpetrator was uncontested. The materiality of Beate Murphy's hearsay declaration about the appellant's absence from the apartment on the night of 16 August was tenuous at best, since the time of the victims' deaths was uncertain. Finally, her inadmissible statements linking the appellant to the yellow Opel are cumulative with other clearly admissible evidence. Another witness, a soldier in the appellant's unit, testified that he saw the appellant driving the yellow Opel on 18 August. The police testified that the hammer and gloves seized from the yellow Opel were found where the appellant said he left them, and they matched the description in his confessions. We are satisfied beyond a reasonable doubt that the erroneous admission of Beate Murphy's statement had no effect on the findings.

## VI. VOTING INSTRUCTIONS

■ The appellant contends that the military judge incorrectly instructed the court members on the procedures for voting on findings. The military judge instructed the members as follows:

The junior member of the court will collect and count the vote. *He will not examine the content of the vote.* The votes should be on paper and the paper should be folded over. The junior member should collect and count the votes. There should be six votes. The president will check the count and then immediately announce the result of the ballot to the members (emphasis added).

We agree that this procedural instruction was incorrect, but we find that the error was harmless for the reasons set out in *United States v. Kendrick,* 29 M.J. 792 (A.C.M.R.1989). Because the findings were unanimous and announced as such, there is no reasonable possibility that the votes were miscounted or incorrectly announced.

## VII. VALIDITY OF RULE FOR COURTS–MARTIAL 1004

The appellant contends that Rule for Courts–Martial 1004, which prescribes capital sentencing procedures for courts-martial, is invalid, for four reasons: (1) the President exceeded his authority in promulgating Rule for Courts–Martial 1004; (2) Rule for Courts–Martial 1004 deprives the appellant of equal protection by subjecting him to the death penalty for an offense which is not punishable by death under the federal criminal code; (3) Rule for Courts–Martial 1004 fails to incorporate "Congressionally mandated protections" to prevent racially motivated imposition of the death penalty; and (4) the aggravating factor in Rule for Courts–Martial 1004(C)(7)(I) is too vague.

## A. Presidential Authority

The appellant contends that the procedures under which he was sentenced are invalid because the President exceeded his authority under the Constitution and of Article 36 of the Uniform Code of Military Justice, 10 U.S.C. § 836, in promulgating Rule for Courts–Martial 1004. We find that this contention is without merit.

In *United States v. Matthews*, 16 M.J. 354 (C.M.A.1983), the Court of Military Appeals upheld the constitutionality of the death penalty imposed by courts-martial, but held that the capital sentencing procedures in the Manual for Courts–Martial were defective. In the majority opinion, Chief Judge Everett observed that "[t]he great breadth of the delegation of power to the President by Congress with respect to court-martial procedures and sentences grants him the authority to remedy the present defect in the court-martial sentencing procedure for capital cases." *Id.* at 381.

Congress has limited the authority of courts-martial to impose the death penalty, restricting it to offenses expressly punishable by death in the punitive articles of the Uniform Code of Military Justice. UCMJ art. 18, 10 U.S.C. § 818 (1982). Congress also has empowered the President to impose limits on punishments below that authorized by statute. UCMJ art. 56, 10 U.S.C. § 856 (1982). Finally, Congress has empowered the President to establish procedures for courts-martial, including sentencing procedures. UCMJ art. 36, 10 U.S.C. § 836 (1982). The President has exercised his rule-making power in promulgating Rule for Courts–Martial 1004. We hold that the President has not exceeded his authority in promulgating Rule for Courts–Martial 1004. *See generally* Sullivan, *The President's Power to Promulgate Death Penalty Standards*, 125 Mil.L.Rev. 143 (1989).

## B. Equal Protection

The appellant also contends that Rule for Courts–Martial 1004 deprives him of equal protection, and hence due process under the fifth amendment, because it subjects him, as a member of the armed forces, to the death penalty for a crime which is not punishable by death under the United States criminal code. He argues that section 1111 of title 18, United States Code, proscribes the crime of premeditated murder and authorizes the death penalty, but that the statute was found unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh'g denied*, 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972). *See* 18 U.S.C. § 1111 (Supp. IV 1986). Since *Furman*, Congress has not enacted corrective legislation. Thus, appellant argues that he is denied equal protection by virtue of his status without any showing that this "discrimination" is necessary to accomplish a compelling governmental interest.

We disagree with the appellant's analysis. First, *Furman* did not hold that the death penalty is unconstitutional. It held that the procedures by which the death penalty was imposed in that case were unconstitutional. Second, Congress has not, by its inaction, disapproved the death penalty. When Congress amended the Controlled Substances Act, 21 U.S.C. § 848 (1982 and Supp. V 1987), it specifically authorized the death penalty for certain drug-related offenses. Continuing Drug Enterprises Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986) (codified at 21 U.S.C.A. § 848(e)–(n) (West Supp.1990)). Third, the Supreme Court has made it clear that *Furman* invalidated only the capital sentencing procedures, not the death penalty itself. In *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), *reh'g denied*, 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977), the Supreme Court held that a sentence to death was not *ex post facto* even though sentencing procedures were invalidated under *Furman* and then amended to meet constitutional requirements after the offense was committed. The Court held that enactment of new sentencing procedures "neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, nor changed the proof necessary to convict." *Id.* 432 U.S. at 293, 97 S.Ct. at 2298.

We hold that the appellant has not been deprived of equal protection by virtue of his status as a member of the armed forces.

### C. Protection Against Racially Motivated Imposition of the Death Penalty

The appellant contends that Rule for Courts–Martial 1004 "fails to incorporate Congressionally mandated protections to prevent racially motivated imposition of the death penalty in violation of Article 55 of the Uniform Code of Military Justice, and the eighth amendment to the Constitution." Both Article 55, 10 U.S.C. § 855 and the eighth amendment prohibit "cruel and unusual punishment." Arbitrary and capricious imposition of the death penalty is "cruel and unusual." *Furman v. Georgia,* 408 U.S. at 238, 92 S.Ct. at 2726.

 The appellant points out that Congress recently amended section 848 of title 21, United States Code, to require that the jury be instructed not to consider race in its sentencing deliberations and to certify that race was not a factor in recommending a sentence. 21 U.S.C.A. § 848 (West Supp.1990). He argues that the jury instruction and certification are applicable to all capital sentencing proceedings, including the appellant's court-martial. We hold that those requirements have not been imposed on courts-martial and are not required by the Constitution.

First, the amendment was enacted after the appellant was tried and sentenced. Second, it applies by its terms only to drug-related offenses prosecuted under section 848 of title 21, United States Code. 21 U.S.C.A. § 848 (West Supp.1990). Third, the trial defense counsel in appellant's case asked all members of the court if they would disregard race in their deliberations and received an affirmative response from all members. Fourth, the appellant did not request this instruction. Finally, the appellant has not contended before the court-martial or this court that his conviction or sentence were racially influenced, nor is there any evidence of racial motivation. We find this contention to be without merit.

### D. Validity of Rule for Courts–Martial 1004(c)(7)(I)

The appellant contends that "the aggravating factor enumerated in R.C.M. 1004(c)(7)(I) fails to sufficiently clarify persons eligible for the death penalty and is therefore invalid under the fifth and eighth amendment [sic] to the constitution."

Rule for Courts–Martial 1004(c)(7)(I) provides the following aggravating circumstance: "[t]he murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim."

After sentencing instructions, the president of the court requested a clarification of the term "prolonged." The military judge defined it as, "more than instantaneous."

The members found the following aggravating factors:

(1) The appellant was convicted of more than one violation of UCMJ art. 118, in the same case (R.C.M. 1004(c)(7)(J));

(2) The murder of Petra H. Murphy was preceded by the intentional infliction of substantial physical harm (R.C.M. 1004(c)(7)(I)); and

(3) The murder of Petra H. Murphy was preceded by the intentional infliction of "prolonged substantial mental or physical pain and suffering to the victim" (R.C.M. 1004(c)(7)(I)).

The appellant argues that the circumstance of "prolonged substantial mental or physical pain and suffering to the victim" does not pass constitutional muster.

 The death penalty violates neither the eighth amendment nor the fourteenth amendment. *See generally Gregg v. Georgia,* 428 U.S. 153, 168–187, 96 S.Ct. 2909, 2922–32, 49 L.Ed.2d 859 (1976), *reh'g denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). However, the constitutional prohibition against cruel and unusual punishment and the constitutional notion of equal protection do forbid the "arbitrary and capricious" imposition of the death penalty. *See generally Gregg v. Georgia,* 428 U.S. at 188–189, 96 S.Ct. at 2932–33.

Accordingly, the discretion of the sentencing authority "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. at 189, 96 S.Ct. at 2932. This principle was most recently reasserted in *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988):

> [s]ince [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.

*Id.* at 362, 108 S.Ct. at 1858. Additionally, the procedure must assure a meaningful basis for appellate review of the sentencing authority's action. *See Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976).

The Supreme Court has ruled that this may be accomplished in one of two ways. The legislature may itself "narrow the definition of capital offenses" or the legislature may broadly define capital offenses and provide for procedures by which the jury performs the narrowing function by finding aggravating factors at the penalty phase. *See generally Lowenfield v. Phelps*, 484 U.S. 231, 244–246, 108 S.Ct. 546, 561–63, 98 L.Ed.2d 568 (1988), *reh'g denied*, 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988).

The almost universal response to the holding of the Supreme Court was the creation of a "two-step" sentencing process in which findings of particularized aggravating factors are required preliminary to deliberations on the sentence. *See, e.g., Gregg v. Georgia*, 428 U.S. at 197, 96 S.Ct. at 2936. When the Supreme Court approved this procedure, it observed:

> [t]he new Georgia sentencing procedures ... focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find

and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.

*Id.* at 206–207, 96 S.Ct. at 2941.

██ However, the mere prescription of aggravating circumstances may not satisfy the requirements of *Furman* if the specified aggravating circumstance is so vague that its limiting effect on the discretion of the jury is only cosmetic. "A capital sentencing scheme must ... provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'" *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), *cert. denied*, 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180 (1982), *reh'g denied*, 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982) (quoting *Gregg v. Georgia*, 428 U.S. at 188, 96 S.Ct. at 2932, and *Furman v. Georgia*, 408 U.S. at 313, 92 S.Ct. at 2764). It must "genuinely narrow the class of persons eligible for the death penalty." *Lowenfield v. Phelps*, 484 U.S. at 244–246, 108 S.Ct. at 561–63. Consequently, a specified factor may fail to adequately "inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*." *Maynard v. Cartwright*, 486 U.S. at 361–362, 108 S.Ct. at 1858. *Accord Gregg v. Georgia*, 428 U.S. at 195 n. 46, 96 S.Ct. at 2935 n. 46.

██ Challenges premised upon an assertion of vagueness "are analyzed under the Eighth Amendment." *Maynard v. Cartwright*, 486 U.S. at 361, 108 S.Ct. at 1858. A provision will pass constitutional muster if the language of the provision standing alone explicitly or implicitly restrains the discretion of the sentencing authority. *Cf. Godfrey v. Georgia*, 446 U.S. at 428, 100 S.Ct. at 1764–65 ("[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the

death sentence"). Even if the language of the aggravating circumstance fails to pass constitutional muster in its own right, judicial interpretation or construction of the language of the aggravating circumstance may suffice to keep the aggravating circumstance within constitutional bounds. *See generally Godfrey v. Georgia*, 446 U.S. at 429–432, 100 S.Ct. at 1765–67. This proposition is well-illustrated by *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), *reh'g denied*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1975), and *Maynard v. Cartwright*, 486 U.S. at 356, 108 S.Ct. at 1853.

■ Both *Proffitt* and *Cartwright* analyzed a statutory aggravating circumstance which authorizes the death penalty if the murder is "especially heinous, atrocious or cruel." In *Proffitt*, the Supreme Court upheld the imposition of the death penalty, observing that the Florida Supreme Court had interpreted this circumstance as directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," *Proffitt v. Florida*, 428 U.S. at 255, 96 S.Ct. at 2968 (quoting *State v. Dixon*, 283 So.2d 1, 9 (Fla.1973), *cert. denied sub nom., Hunter v. Florida*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1973)), and holding: "[w]e cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt v. Florida*, 428 U.S. at 255–256, 96 S.Ct. at 2968. In *Cartwright*, the Supreme Court considered an identically phrased aggravating circumstance in Oklahoma but invalidated the appellant's death sentence, because the Oklahoma courts, unlike the Florida courts in *Proffitt*, had not "adopted a limiting construction that cured" the unconstitutionally vague statutory provision. *Maynard v. Cartwright*, 486 U.S. at 360, 108 S.Ct. at 1857. Rule for Courts–Martial 1004(c)(7)(I) must be reviewed within these parameters.

The drafter's analysis states that Rule for Courts–Martial 1004(c)(7)(I) is "more objective" than that found wanting in *Godfrey*. R.C.M. 1004(c)(7)(I) analysis at A21–67. We conclude that the drafters intended to "codify" the aggravating circumstance contemplated by the Georgia Supreme Court when it construed the statutory circumstance "outrageously or wantonly vile, horrible and inhuman." *Godfrey v. Georgia*, 446 U.S. at 430, 100 S.Ct. at 1766 (quoting *Harris v. State*, 237 Ga. 718, 230 S.E.2d 1, 11 (1976), *reh'g denied*, 434 U.S. 882, 98 S.Ct. 247, 54 L.Ed.2d 166, *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251 (1977)). The Georgia court interpreted this circumstance to require "a depravity of mind and either ... torture or an aggravated battery to the victim."

The language of the rule reinforces this conclusion. The element of aggravated battery is reflected in the language, "preceded by the intentional infliction of substantial physical harm"; the element of torture is reflected in the language, "preceded by ... prolonged, substantial mental or physical pain and suffering." *Gregg* tacitly approves these standards; *Godfrey* does so explicitly. *See Gregg v. Georgia*, 428 U.S. at 201, 96 S.Ct. at 2938; *Godfrey v. Georgia*, 446 U.S. at 429–432, 100 S.Ct. at 1765–67. The language of Rule for Courts–Martial 1004(c)(7)(I) implicitly—if not explicitly—reflects this constitutionally permissible standard. Accordingly, we hold that Rule for Courts–Martial 1004(c)(7)(I) is a constitutionally valid aggravating circumstance.

■ However, our holding does not end the inquiry. The sentencing procedure will pass constitutional muster only if the court members are adequately instructed. In this case, the military judge's brief definition of "prolonged" as "more than instantaneous" was inadequate to convey the concept of torture intended by drafters of Rule for Courts–Martial 1004(c)(7)(I). Accordingly, we are not satisfied that the court members applied the proper legal standard in determining that Petra Murphy was subjected to "prolonged, substantial mental or physical pain and suffering."

■ This defect is by no means fatal to the sentencing process. Even without a finding that the appellant inflicted "prolonged" suffering on Petra Murphy, the court's unanimous finding of multiple viola-

tions of Article 118, 10 U.S.C. § 918 (Rule for Courts–Martial 1004(c)(7)(J)) and substantial physical harm preceding the murder of Petra Murphy are sufficient threshold findings to permit imposition of the death penalty.

In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), *cert. denied sub nom., Stephens v. Kemp*, 469 U.S. 1043, 105 S.Ct. 530, 83 L.Ed.2d 417 (1987), *reh'g denied*, 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988), the Supreme Court held that, under that State's sentencing procedure, the invalidation of one aggravating circumstance does not necessarily invalidate the sentence. *Id.* at 884, 103 S.Ct. at 2746. This ruling was premised upon two factors.

First, the Georgia scheme provided for a two-tiered sentencing procedure: "[t]he Georgia scheme provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage." *Id.* at 879, 103 S.Ct. at 2744. "Thus, in Georgia, the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion [to determine an appropriate sentence], apart from its function of narrowing the class of persons ... who are eligible for the death penalty." *Id.* In other words, the determination of aggravating circumstances is merely the constitutionally-required preliminary procedure to determine whether the accused is eligible for the death penalty; once the jury makes the preliminary finding of eligibility, it then deliberates whether to impose the death sentence. *Id.* Thus, the actual sentence determination is not the product of the statutory aggravating circumstances; it is based on the character of the individual and the circumstances of the crime, including any other aggravating factors. Second, the jury in *Stephens* returned specific findings of several constitutionally adequate aggravating circumstances which "were valid and legally sufficient." *Id.* at 881, 103 S.Ct. at 2745. A death sentence supported by at least one aggravating

factor need not be set aside because another aggravating factor is constitutionally invalid. *Id.* at 884, 103 S.Ct. at 2746.

The Supreme Court found that the requirements of *Furman* were satisfied and that the jury was properly limited in deciding whether the accused was eligible for the death sentence. The fact that one of the aggravating factors was invalidated did not affect their ultimate decision to impose the death penalty in that particular case because the jury was to consider the evidence from which it found the aggravating factor in any event.

The procedure prescribed by Rule for Courts–Martial 1004(b)(7) is almost identical:

> [i]n closed session, before voting on a sentence, the members shall vote by secret written ballot separately on each aggravating circumstance ... on which they have been instructed. Death may not be adjudged unless all members concur in a finding of the existence of at least one such aggravating circumstance. After voting on all the aggravating factors on which they have been instructed, the members shall vote on a sentence with R.C.M. 1006.

Thus, even though one of the aggravating factors found by the court members in this case must be invalidated because of the military judge's failure to define the term "prolonged" adequately, *Zant v. Stephens* authorizes us to affirm the death sentence in this case, based on the remaining two aggravating factors which are unaffected by the error.

## VIII. VICTIM–IMPACT EVIDENCE

The appellant next contends that the military judge erred by admitting, over defense objection, victim-impact evidence in violation of the eighth amendment to the Constitution. He argues that the trial counsel established a "sentencing theme" focused on the deep religious beliefs of Petra Murphy which began with opening argument, continued with evidence on the merits, and culminated in testimony about Petra Murphy's personal qualities during the sentencing hearing.

In his opening statement, the trial counsel stated:

[w]e will prove that Petra Murphy was deeply religious. She was a dedicated churchgoer. She taught Sunday School and attended Bible Study with dedication. Petra and her two children attended Sunday services on Sunday, the 16th of August 1987. That's the last time she would ever attend church services.

The appellant did not object to the opening statement.

After the members returned findings of guilty, the appellant moved to exclude a number of items of evidence offered by the government, including the proffered testimony of Ms. Jeanette Gloria Jordan. Citing *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied*, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987), the appellant argued that her testimony would constitute impermissible evidence of the personal characteristics of the victim. The military judge excluded several items of evidence, but admitted the testimony of Ms. Jeanette Gloria Jordan. The military judge observed that "[o]ne of the admissions of the accused is that he was concerned about how Petra Murphy was treating the children" and ruled that the proffered testimony was "relevant on that issue because the court members may consider both what they heard on the merits and in sentencing for a determination of an appropriate sentence." He concluded that the proscriptive rule announced in *Booth v. Maryland* did not apply to a "victim impact statement in the nature of rebuttal."

Ms. Jordan then testified as follows:

Q. Can you tell the court what her hobbies were or her interests?

A. Petra didn't have hobbies like sewing or cooking or working, things like that. Petra's life was mostly her children and living for the Lord.

Q. Where did you most frequently see her?

A. Most of the time if we wasn't in church or we were probably out witnessing[,] talking about the Lord to different people who wanted to hear, or doing things with the children like outings, a party at the Burger King, or pajama party, things like that.

Q. Did you have an opportunity to observe the manner in which she cared for her children?

A. Yes, we spend [sic] quite a bit of time together. I saw Petra just about every day or every other day. So, we wasn't [sic] together about 2 hours but most of the time most of the day.

Q. How did she care for her children?

A. Very well.

Q. I have no further questions, Your Honor.

During his sentencing argument the trial counsel argued, without defense objection, as follows:

[t]he court must now determine an appropriate sentence for the vial [sic], barbaric, despicable, heinous crimes that this soldier perpetrated.

. . . .

Your decision ... should be based upon the cold, objective evidence before this court.

. . . .

Petra, Timmy, and James were murdered violently, left to rot, left to decay.

. . . .

[The appellant] began the evil of his deeds when he flew to North Carolina with Beate and he married Beate Murphy, bigamously. He abandoned his family.

. . . .

Now before you stands the lifeless evidence of what happened next. Page after page after page of the most despicable horrific photographs that you may ever see. At his hands, these people were murdered. At his hands they were left to die and rot and decay as he went upon his appointed rounds.

. . . .

[W]hat about them? Loving mother, churchgoer, very few friends. What about Timmy? What did he want to be, a fireman, policeman, a soldier, a doctor, a lawyer? What about Jay? Is he capable of knowing what he wants to be?

In concluding his argument, the trial counsel urged the members to find the specified aggravating factors and to determine that these factors outweighed the evidence in mitigation.

This court must determine whether the aggregate effect of Ms. Jordan's testimony, trial counsel's opening statement, the photographs of the victims, and trial counsel's sentencing argument were constitutionally permissible under the eighth amendment. In *Booth v. Maryland*, 482 U.S. at 496, 107 S.Ct. at 2529, a sharply divided Supreme Court vacated a death sentence, because the sentencing authority had considered a victim-impact statement required by Maryland's sentencing procedures. Booth had murdered an elderly couple in their own home; he did not know either of the victims. In accordance with the state procedural rule, the victim-impact statement submitted to the jury included descriptions of the personal characteristics of the victims, the emotional impact of the crimes on the victims' families, and the family members' opinions and characterizations of the crime.

 The Supreme Court held that admission and consideration of the victim-impact evidence was, in that case, constitutionally impermissible. The majority focused on the constitutional requirement that "any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.'" *Booth v. Maryland*, 482 U.S. at 508, 107 S.Ct. at 2536 (quoting *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977)). Two principles flow from this requirement. First, imposition of the death sentence must be based on " 'the character of the individual and the circumstances of the crime.'" *Booth v. Maryland*, 482 U.S. at 502, 107 S.Ct. at 2532 (quoting *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2744). Second, evidence considered in determining the sentence must have "some bearing on the defendant's 'personal responsibility and moral guilt.'" *Booth v. Maryland*, 482 U.S. at 502, 107 S.Ct. at 2533 (quoting *Enmund v. Florida*,

458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982)).

The Supreme Court invalidated the Maryland procedure to the extent that it required consideration of victim-impact evidence at a capital sentencing proceeding. The Court observed:

[t]he focus of [the victim-impact statement required by state law], however, is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant. As our cases have shown, the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family.... Allowing the jury to rely on a [victim impact statement] therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the jury's attention away from the defendant's background and record, and circumstances of the crime.

*Booth v. Maryland*, 482 U.S. at 504–505, 107 S.Ct. at 2534.

However, the Supreme Court did not rule that such evidence was constitutionally inadmissible in all cases: "a defendant's degree of knowledge of the probable consequences of his actions may increase his moral culpability in a constitutionally significant manner." *Id.* at 505, 107 S.Ct. at 2534 (citing *Tison v. Arizona*, 481 U.S. 137, 157–158, 107 S.Ct. 1676, 1699, 95 L.Ed.2d 127, *reh'g denied*, 482 U.S. 921, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987)). The Supreme Court noted:

[o]ur disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime.... Moreover, there may be times that the victim's personal characteristics are relevant to re-

but an argument offered by the defendant.

*Id.* 482 U.S. at 507 n. 10, 107 S.Ct. at 2535 n. 10.

The Supreme Court considered a similar issue in *South Carolina v. Gathers,* —— U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876, *reh'g denied,* —— U.S. ——, 110 S.Ct. 24, 106 L.Ed.2d 636 (1989). *Gathers* also involved the murder of a victim whose characteristics were unknown to the defendant. In *Gathers,* an again divided Supreme Court held that a prosecutor engaged in improper argument during sentencing by reading from a religious tract that the victim was carrying and commenting on the victim's personal qualities which he inferred from the victim's possession of the religious tract and a voter registration card. Although the documents were properly admitted into evidence, the Court held that the prosecutor's argument " 'could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill.' " *South Carolina v. Gathers,* 109 S.Ct. at 2210–2211 (quoting *Booth v. Maryland,* 482 U.S. at 505, 107 S.Ct. at 2534).

▮ The case at bar is distinguishable from *Booth* and *Gathers* on two significant points. First, the appellant made three confessions in which he placed some of the blame for the murders on Petra Murphy. He attributed the argument and altercation which preceded the murders to her neglect of his son, James. He asserted that she was the aggressor in the altercation, striking and scratching him and then attacking him with a knife. He asserted that he tried to render medical assistance to an injured child and she prevented him from doing so by brandishing or attacking him with a knife; he then retreated, obtained the murder weapon from his car, returned to the scene and killed her. While his assertions, if true, would not relieve the appellant of criminal liability for premeditated murder, they would, if accepted by the fact-finder, constitute mitigating circumstances. Evidence of Petra Murphy's character afforded the members a basis from which to assess the truthfulness of the appellant's

versions of events and to infer the existence or nonexistence of mitigating factors. Under these circumstances, evidence of Petra Murphy's character was probative of the circumstances of the crime and admissible on sentencing. *See* Mil.R.Evid. 401, 404(a)(2), 406.

Second, the appellant, unlike the defendants in both *Booth* and *Gathers,* knew his victims intimately. Evidence of the victim's character, when the victim is known by the murderer, permits the sentencing authority to view the crime through the eyes of the murderer, thus providing insight into the offender's state of mind and moral culpability. In other words, the accused's knowledge of the victim's personal qualities may increase the accused's moral culpability "in a constitutionally significant manner." *Booth v. Maryland,* 482 U.S. at 505, 107 S.Ct. at 2535.

The sentencing authority is charged with making an " 'an individualized determination' of whether the defendant in question should be executed, based on 'the character of the individual and the circumstances of the crime.' " *Booth,* 482 U.S. at 502, 107 S.Ct. at 2532. We hold that evidence of the victim's character was, in this case, constitutionally permissible. It cannot be said that the personal characteristics of the victims in this case are "wholly unrelated" to the circumstances of the crime, the appellant's "blameworthiness," or his "moral culpability." *Id.* at 504, 107 S.Ct. at 2533.

▮ Nevertheless, we must ensure that the evidence and argument based on this evidence did not unduly inflame the passions of the members and impermissibly impact on their deliberations: "any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.' " *Id.* at 508, 107 S.Ct. at 2536 (quoting *Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1204). The sentence to death must be based on the appellant's character and the circumstances of the crime together based on justifiable inferences drawn from the victim-impact evidence and not on the victim-impact evidence alone. *Cf. Booth v. Maryland,* 482 U.S. at 506, 107 S.Ct. at 2534–35 (there is

no justification for imposing the death penalty based on the perception that the victim was of sterling character). Further, we must consider the record in its entirety, including the argument of counsel.

■ Although the trial counsel mentioned Petra Murphy's religious convictions and her qualities as a good mother, these characteristics were a minor, subsidiary theme of his argument. His argument focused on the brutality of the attack on Petra Murphy, the fact that two of the appellant's victims were innocent infants, and the lack of mitigating evidence. The fact that Petra Murphy was active in her church pales in significance alongside evidence that the appellant committed three premeditated, unprovoked, murders: choking, bludgeoning, and then drowning a woman, drowning her five-year-old child, and then drowning his own twenty-one-month-old child to divert suspicion from himself. *See Bertolotti v. Dugger*, 883 F.2d 1503, 1528 (11th Cir.1989), *reh'g denied en banc*, 897 F.2d 537 (11th Cir.1990) (evidence of victim's characteristics admissible because relevant and "of a markedly different scope and tone from the evidence condemned by the *Booth* Court.")

Viewed in this light, we add that, even assuming error in the admission of evidence of Petra Murphy's character, we are satisfied beyond a reasonable doubt that the member's deliberations were not impermissibly affected by the introduction of character evidence. *See Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (reviewing court can apply harmless error rule to inadmissible sentencing evidence in a capital case).

■ Finally, we turn to the question whether the victim-impact evidence, when combined with gruesome photographs and arguments of the prosecutor, is so inflammatory as to violate the eighth amendment. We find that it is not. Viewing the record as a whole, we find that the circumstances of the crimes predominate, not the photographs, the argument of counsel, or the qualities of Petra Murphy. We are satisfied beyond a reasonable doubt that the appellant was sentenced to death because of the seriousness of his crimes and not because of gruesome photographs, the religious activities of Petra Murphy or trial counsel's comments thereon. Accordingly, we hold that the appellant was properly sentenced, based on relevant, constitutionally permissible considerations.

## IX. THE SENTENCE

■ Mindful of our obligation under article 66(c) of the Uniform Code of Military Justice, we have independently weighed the evidence and are satisfied that the aggravating factor in Rule for Courts–Martial 1004(c)(7)(J), multiple violations of Article 118, is established beyond a reasonable doubt by the evidence. Likewise, we are satisfied that the murder of Petra Murphy was preceded by "intentional infliction of substantial physical harm." R.C.M. 1004(c)(7)(I). We are satisfied that the aggravating circumstances substantially outweigh the extenuating and mitigating circumstances of the offenses. R.C.M. 1004(b)(4)(C). Accordingly, we hold that the death sentence is legally correct.

Fulfilling our unique obligation to approve only those sentences which we find appropriate, we have reviewed the entire record, including the circumstances of the offenses, the appellant's military record and civilian background, and the appellant's expressions of remorse. We have weighed the evidence and have carefully considered the appellant's sentencing statement as well as the argument of trial defense counsel. We find that the death penalty is appropriate. Accordingly, the findings of guilty and the sentence are affirmed.

Acting Chief Judge DeFORD, Senior Judge MYERS, Senior Judge KUCERA, Judge JOHNSON, Judge KANE, Judge GILLEY, Judge SMITH, Judge VARO, and Judge GIUNTINI concur.

Judge GRAY, Judge WERNER, and Judge NEURAUTER did not participate in the decision of this case.