UNITED STATES, Appellee,

v.

Sergeant James T. MURPHY, 238–25–4374, United States Army, Appellant.

ACMR 8702873.

U.S. Army Court of Military Review.

30 March 1993.

For Appellant: Captain Paul H. Turney, JAGC (argued), Captain Victor A. Tall, JAGC (argued), Captain Robin N. Swope, JAGC, Captain Michael P. Moran, JAGC, Captain Kurt J. Mayer, JAGC (on brief); Lieutenant Colonel Russell S. Estey, JAGC.

For Appellee: Major Timothy W. Lucas, JAGC (argued), Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC (on brief).

Before the Court Sitting En Banc.

## OPINION OF THE COURT ON REMAND

De GIULIO, Senior Judge:

Appellant was tried at a general court-martial consisting of officers in November and December 1987. Contrary to his pleas, he was found guilty of three specifications of premeditated murder, larceny, bigamy, and false swearing, in violation of Articles 118, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 934 (1982) [hereinafter UCMJ]. He was sentenced to total forfeitures, reduction to Private E1, and to be put to death. The convening authority approved the sentence.

On 25 March 1990, this Court affirmed the findings of guilty and the sentence. *United States v. Murphy*, 30 M.J. 1040 (A.C.M.R.1990) (en banc). On 14 April 1992, the United States Court of Military Appeals remanded the case to this Court to reexamine the sentence imposed in light of *United States v. Curtis*, 32 M.J. 252 and 33 M.J. 101 (C.M.A.1991). *United States v. Murphy*, 36 M.J. 8 (C.M.A.1992) (summary disposition). On 19 June 1992 the United States Court of Military Appeals treated a petition for extraordinary relief by appellant as a motion to clarify the court's remand order and amended the 14 April 1992 order so "[c]ounsel may raise any issues not previously considered by the court." *Murphy v. Judges of United States Army Court of Military Review*, 34 M.J. 310 (C.M.A.1992). After receiving several extensions of time, appellant has filed thirty-eight supplemental assignments of error with this Court.

The facts of this case are summarized in this Court's original opinion as follows:

The victims were the appellant's former wife, Petra Murphy, Petra's five-year-old

son by a former marriage, Tim A. Herstroeter, and the appellant's twenty-one-month-old son by Petra Murphy, James. They were killed at some time prior to the appellant's departure from Germany on 20 August 1987, pursuant to orders reassigning him to Redstone Arsenal, Alabama. The appellant married Beate Murphy on 12 June 1987, without benefit of a divorce from Petra Murphy; thus, the bigamy conviction. Although an acrimonious divorce proceeding was pending in the German courts, the appellant filed for a divorce from Petra Murphy in Sampson County, North Carolina. The North Carolina court entered a decree of divorce on 22 July 1987, based on Petra Murphy and the appellant living apart for more than one year.

Petra Murphy was last seen alive by Private First Class (PFC) Carlos Ruddy, a church acquaintance, on the afternoon of Sunday, 16 August 1987. Because Petra Murphy did not own an automobile, PFC Ruddy had given her a ride to the local post exchange and then carried groceries up to her apartment. On Monday, 17 August, Mrs. Kathy Swift, also a church friend, took her two children to Petra Murphy's apartment so that Petra could baby-sit the children. Although Petra was usually very reliable, there was no answer when Mrs. Swift knocked on the door. Mrs. Swift became concerned and checked at the kindergarten Tim attended and found that Tim was absent. Chief Warrant Officer Two (CW2) Betram Smith, Petra's pastor, became concerned after Petra missed several church activities, because she always called when she could not attend. CW2 Smith went to the apartment on Wednesday and again on Thursday or Friday but no one answered the door. He visited the apartment again on Sunday, 23 August, after Petra missed church services. He noticed an odor

coming from the kitchen window and notified the German police.

The German police entered the apartment through a window. In the bathroom, they discovered the dead bodies of Petra, Tim and James. The bodies of the children lay in a partially filled bathtub. Tim was lying face up, James face down. Petra was in a kneeling position beside the tub, her head draped into the water.

Professor Doctor Hans Fredrick Brettel, a forensic pathologist, testified that Petra died by drowning; however, she had also suffered at least four severe blows to the head prior to death. One blow fractured her skull. Dr. Brettel testified that Petra may have been unconscious at the time that her head was submerged, but he could not be certain. He detected injuries indicative of choking on her neck. There were no defensive injuries on her hands or legs.

Dr. Brettel's examination of the bodies of the children revealed that both had died from drowning. He opined that the children were alive and conscious at the time of drowning. There was no evidence of any other physical injuries.

On 27 August 1987, Special Agent (SA) Charles F. Woodall of the United States Army Criminal Investigation Command (CID) interviewed the appellant at the CID office at Redstone Arsenal, Alabama, the appellant's new duty station. The appellant waived his UCMJ article 31 rights.[1] Initially, the appellant denied all knowledge of the murders and denied having been at Petra's apartment. On further questioning, the appellant admitted that he had been at Petra's apartment on the day of the murders, but insisted that he had not harmed the children. He did, however, admit that he had killed Petra: "[w]hat would you say if I told you that I killed her because she killed the children?"

---

1. UCMJ art. 31(b), 10 U.S.C. § 831(b)(1982), provides that "[n]o person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a court-martial."

The appellant stated that he had gone to the apartment to say good-bye. He and Petra argued when the appellant told her that he wanted custody of the children. According to the appellant, Petra took the children to the bathroom for a bath and returned ten or fifteen minutes later and announced that the appellant could not take them because they were dead. In this version of events, the appellant killed Petra because she had killed the children.

The appellant stated that he choked Petra but fled when she obtained a knife from the kitchen. He went to his car, put on gloves, and returned to the apartment carrying a mason's hammer. The appellant said that he returned to the apartment, asked Petra why she had killed the children, and hit her with the hammer only after she came at him with the knife. "I just stood there for a couple of minutes stunned. I could not believe what had happened and was stunned." The appellant rearranged the crime scene to make it look "like someone had broken in." He departed, taking Petra's car keys, her military identification card, and the knife she allegedly used to assault him. The appellant revealed how and where he had disposed of the keys, identification card and knife, but stated that the hammer and gloves were still in the trunk of his car. This statement was reduced to writing, sworn and signed by the appellant. The appellant also drew a detailed diagram of the bathroom correctly identifying the positions of the bodies.

SA Woodall then told the appellant that he did not entirely believe the appellant's rendition of events. The appellant responded: "[w]hat would you say if I told you that I killed one of the children and Petra killed the other one?" The appellant then stated that he had killed Petra and Tim in retaliation for Petra killing James. This oral statement was not reduced to writing. SA Woodall again advised the appellant that he did

not believe him because the CID investigation had revealed that [Tim] [2] had been killed first. The appellant then gave a third version, which was reduced to writing.

In this version, the appellant stated that most of his earlier accounts were true but that, "[t]he only portion I need to change is that part that pertains to what happened after I arrived at PETRA'S house." In this version, he and Petra were physically fighting when he began choking Petra. Tim attempted to interpose himself between the two and the appellant knocked him away. "I did not mean to hurt him but when I looked I saw that he was laying still on the floor and that his tounge [sic] was sticking out and there was blood coming from his mouth." Alarmed, the appellant "quit choking Petra." She went to the kitchen and returned with a knife. The appellant ran to his car for his gloves and hammer. When he returned, Petra attacked him and he bludgeoned her with the hammer. The appellant explained:

> I was stunned so I went to the bathroom and filled the tub with water. I then went and got Tim and placed him face up in the water and walked away. I then went to the bedroom where James was sleeping and got him. This woke him up a little and I carried him and placed him in the tub. I sat him down and held his face under water about five seconds but then realized that I could not kill my son so I allowed him to come up. I then walked away and I heard him coughing and assumed he was okay. I then went and got PETRA and placed her over the tub as previously stated. At that time I saw that James was not moving and was laying [sic] in the water but I saw that his face was out of the water. I did not check him.

According to the appellant, he then left the apartment.

**2.** Our opinion of 25 May 1990 incorrectly reflected that SA Woodall said James had been

killed first.

This was the final written form of the appellant's statement. At the conclusion of the interview, SA Woodall asked the appellant why he had killed James, his own son. The appellant explained that he killed James because the authorities would "automatically assume" that he was the perpetrator if James survived.

While in the Mannheim Confinement Facility, the appellant also confessed his guilt to two fellow inmates, Steve Offill and Private Michael French. The appellant told both Offill and French he wanted to take the blame fully and wanted to avoid implicating his present wife, Beate Murphy. The appellant's confessions to Offill and French were consistent with his final written statement to SA Woodall.

French testified that the appellant stated, after recounting events up to the point where Petra lost consciousness, that "he said it was like a voice that was in his mind, telling him to '[g]o get your other son because he knows you were there as a witness.'" In French's recollection of this version, the appellant likewise released James when he began to struggle and "went back into the living room and got his wife that was unconscious and his son that was unconscious and took them into the bathroom and placed them both face down into the bathtub ... Then he left." The appellant told French that this version "protected someone he loved."

In an admission to Sergeant First Class James R. Marek, the appellant stated that he had gone to say good-bye to his son but that Petra had met him at the top of the stairs with a knife. He retreated, got the hammer from the car, and confronted Petra. In this version, Tim interferes and is injured. In an ensuing struggle between the appellant and Petra, the appellant falls on Tim and breaks his ribs. Petra is thereafter injured. When the appellant sees both of them lying on the floor unconscious, he acts to "cover up" his misconduct by drowning his son.

*Murphy,* 30 M.J. at 1045–47 (second footnote added).

We have reviewed appellant's supplemental assignments of error and find them to be without merit. We have also conducted the proportionality review that was the original purpose of the remand. We affirm the findings of guilty and the sentence.

## I. Jurisdiction

■ Appellant asserts five errors concerning the right of the United States to exercise jurisdiction in this case. These errors are as follows: [3]

APPELLANT WAS DENIED DUE PROCESS, EQUAL PROTECTION AND A FAIR HEARING BECAUSE THE US GOVERNMENT AUTHORITIES WITHHELD PERTINENT JURISDICTIONAL INFORMATION FROM OR PROVIDED MISLEADING INFORMATION TO GERMAN AUTHORITIES SUCH THAT APPELLANT WAS IMPROPERLY SUBJECTED TO CAPITAL PUNISHMENT UNDER THE UCMJ.

EXTRADITING APPELLANT FROM THE FEDERAL REPUBLIC OF GERMANY TO THE UNITED STATES OF AMERICA TO STAND TRIAL FOR PREMEDITATED MURDER FOR WHICH THE PENALTY UPON CONVICTION COULD BE DEATH CONSTITUTED A BREACH OF APPELLANT'S RIGHTS GUARANTEED UNDER THE EUROPEAN CONVENTION ON EXTRADITION, THE EUROPEAN CONVENTION FOR THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS, AND THE SIXTH PROTOCOL TO THE EUROPEAN CONVENTION ON HUMAN RIGHTS AND VIOLATED HIS CONSTITUTIONAL RIGHT TO EQUAL PROTECTION. [4]

THE SECRETARY OF STATE AND THE DEPARTMENT OF STATE AS AGENTS AND REPRESENTATIVES

---

**3.** These issues were raised as Errors I, II, III, and IV, respectively, in appellant's Supplemental Assignment of Errors Following Remand.

**4.** Although not crucial to our decision on this matter, it appears that the United States is not a signatory to these agreements.

OF THE PRESIDENT OF THE UNITED STATES HAVE GUARANTEED THAT THE DEATH SENTENCE WILL BE COMMUTED IN APPELLANT'S CASE AND GIVEN A MINISTERIAL COMMITMENT THAT CLEMENCY WILL BE RECOMMENDED.

THE EXISTENCE OF USAREUR REGULATION 550-56: EXERCISE OF JURISDICTION BY FEDERAL REPUBLIC OF GERMANY COURTS AND AUTHORITIES OVER U.S. PERSONNEL (11 OCT. 1983 AND C1 16 OCT. 1986) AND 18 U.S.C. § 953, LOGAN ACT, PRECLUDED APPELLANT'S TRIAL DEFENSE COUNSEL FROM EFFECTIVELY AND ZEALOUSLY REPRESENTING APPELLANT AS WELL AS DENYING HIM DUE PROCESS.[5]

In a related assertion of prosecutorial misconduct, appellant alleges that the failure of U.S. government authorities to disclose true and accurate facts concerning the "nondependent" status of Petra and Tim constituted misconduct, which violated appellant's rights to due process and equal protection. He asserts that this misconduct denied him exculpatory mitigating evidence that would have been material in preventing the exercise of jurisdiction by U.S. authorities and a capital referral.[6]

As relates to all these issues, we believe the law is well settled. *See Ponzi v. Fessenden*, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922) (an accused lacks standing to contest the determination leading to the assumption of jurisdiction over his case by one sovereign as opposed to another); *Porter v. Eggers*, 32 M.J. 583 (A.C.M.R. 1990) (petitioner lacks standing to contest the determination that the U.S. rather than the host nation will exercise jurisdiction); *United States v. Evans*, 6 M.J. 577

(A.C.M.R.1978) (an accused lacks standing to challenge the jurisdiction of a sovereign over him in cases of discretionary exercise of sovereignty by one sovereign rather than another); *United States v. Bowie*, 34 C.M.R. 808 (A.F.B.R.1964) (any question whether the exercise of jurisdiction by the U.S. violated an international agreement is entirely a matter between sovereigns and it is the sovereign rather than the accused who would be entitled to protest). *See also United States v. Murphy*, 30 M.J. 1040, 1047-48 (A.C.M.R.1990) *remanded*, 36 M.J. 8 (C.M.A.1992). These assertions of error are without merit.

## II. Admissibility of Appellant's Statements

Appellant makes several assertions of error concerning his numerous confessions and admissions. He asserts:[7]

APPELLANT'S CONFESSIONS WERE COERCED BY IMPLIED THREATS TO ARREST HIS [PUTATIVE] WIFE AND THUS WERE INVOLUNTARY AND MUST BE SUPPRESSED.

APPELLANT WAS DELIBERATELY MISADVISED AS TO THE AVAILABILITY OF COUNSEL AND AS TO WHEN APPELLANT WOULD BE ABLE TO TALK TO COUNSEL THEREBY RENDERING INVALID HIS RIGHTS WAIVERS.

APPELLANT'S SECOND SWORN STATEMENT ADMITTING TO THE MURDER OF TIM AND JAMES JR. WAS OBTAINED AFTER A POLYGRAPH THAT WAS CONDUCTED IN CONTRAVENTION OF CID REGULATIONS AND THEREFORE MUST BE SUPPRESSED.

█ Appellant made several confessions to the CID and to fellow inmates while in

---

5. In this assignment of error, appellant maintains that his counsel was precluded from representing him in an attempt to get the German authorities to invoke the primary right to exercise jurisdiction in this case. Although the United States Court of Military Appeals' amended order stated, "Counsel may raise any issues not previously considered by the court ...," this assertion is an example of several previously raised. See *United States v. Murphy*, 30 M.J. 1040 (A.C.M.R.1990) *remanded*, 36 M.J. 8 (C.M.A.1992) (summary disposition). Because

the United States Court of Military Appeals has shown extraordinary caution in this case, this court has again entertained such assertions.

6. We find no government misconduct in this respect.

7. These issues were all raised as Error V of appellant's Supplemental Assignment of Error Following Remand.

pretrial confinement. In addition, he made an admission to a noncommissioned officer. At trial, before pleas were entered, appellant neither made a motion to suppress these statements nor did he object when they were offered into evidence. The defense must object to or move to suppress admissions or confessions before submission of a plea, and failure to so move or object constitutes waiver. Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 304(d)(2)(A). Such procedural waiver rules pass constitutional muster. *Wainwright v. Sykes,* 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). We hold that the issues now asserted by appellant have been waived.

■ Having found waiver, we feel compelled to address the issue of ineffective assistance of counsel for not having moved to suppress the statements or objecting to them. We note from the record that trial defense counsel attempted to present a defense using the theory that appellant confessed to protect Beate, the wife of his bigamous marriage. The picture trial defense counsel tried to create was that Beate committed the murders, gave all the details to appellant, and appellant confessed to the killings in an attempt to protect Beate. Although unsuccessful, the use of this tactic does not render his counsel ineffective. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

III. Conflict of Interest and Ineffective Assistance of Counsel

Appellant asserts that he was denied effective assistance of counsel because his defense team could not provide him conflict-free representation. Appellant was represented by Captain (CPT) V, lead counsel, and CPT S. CPT S had represented Private French in a criminal matter *unrelated* to appellant's case. CPT S represented Private French through arraignment of his case. In addition, he had negotiated a pretrial agreement on behalf of Private French. CPT S had been assigned to assist CPT V in the representation of appellant.

When Private French revealed he had heard appellant confess his guilt while they were in pretrial confinement, CPT S assisted Private French in obtaining a new counsel and withdrew as Private French's counsel. The same military judge presided over French's case and appellant's case. He granted CPT S's motion to withdraw from French's case. At appellant's trial, Private French testified that appellant had described how appellant had killed his family. No objection was made to the testimony, and Private French was not cross-examined. Appellant points to this lack of objection and cross-examination as evidence of a conflict of interest, which he contends violates the Sixth Amendment of the Constitution and military law.

■ When an objection at trial is made that counsel has a conflict caused by multiple representation, the objection itself is sufficient for relief, without a showing of adverse impact. *See Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). When no objection is made at trial, appellant must show that an actual conflict of interest adversely affected his attorney's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). These rules were applied by the United States Court of Military Appeals in *United States v. Breese,* 11 M.J. 17 (C.M.A.1981). When the military judge is on notice that multiple representation has occurred, he must conduct a suitable inquiry into the possible conflict. *Id.* Where he has not conducted a suitable inquiry, the Court of Military Appeals shall presume, subject to rebuttal, that the activities of defense counsel exhibit a conflict of interest. *Id.* This rule presupposes that the military judge knew or should have known of the conflict of interest. Of course, defense counsel, upon a discovery of a conflict of interest has an ethical obligation to advise the court. *Cuyler,* 446 U.S. at 346, 100 S.Ct. at 1717; *Breese,* 11 M.J. at 20 and 22 n. 13.

A review of the affidavits admitted as appellate exhibits before this Court clari-

fies this issue.[8] In his affidavit, appellant denies that either of his counsel discussed with him CPT S's representation of Private French. He claims he was never asked if he had a problem with representation. He further claims that neither the term "conflict of interest" nor its ramifications were explained to him. He states that defense appellate counsel first explained the term and its ramifications to him. He states, "now that 'conflict of interest' has been explained to me as well as the consequences and impact this would have had on my representation and trial, I would not have consented to representation by either CPT [V] or [S]."

In his affidavit, the military judge states that conflict of interest was not one of the several issues litigated in appellant's trial. He states that he presided at the French trial and granted CPT S's request to withdraw because French no longer wanted him to serve as his counsel. He states:

French's case was one of the scores of jury and non-jury trials that I presided over from July—December 1987. When French testified at Sergeant Murphy's trial I did not remember Cpt. [S]'s brief appearance and subsequent withdrawal as counsel at his arraignment. Neither counsel for the defense nor counsel for the United States mentioned Captain [S]'s appearance at French's arraignment. Consequently, I did not perceive any issue of conflict of interest in Captain [S]'s representation of Sergeant Murphy.

In his affidavit, CPT S states that the problem was discussed with appellant, that he would request leave to withdraw from the French case, but might possibly be removed from appellant's case. He states that between CPT V, the regional defense counsel, CPT S, and appellant, they decided that CPT S should continue representation of appellant to allow continuity in his defense. He states:

Due to [appellant's] irresistible impulse to confess his alleged crimes to anyone who would listen, CPT [V] and I, on our own developed the theory that "Beata [sic] might have done it" and [appellant] was protecting her ... French's testimony fit the theory of our case ... CPT [V] was in charge of the case in chief. That is, I handled the opening statement and CPT [V] handled all matters thereafter through a verdict by the panel. It was our decision that should the panel not believe our theory that "Beata [sic] might have done it," they would not be in any mood to listen to CPT [V]'S plea for [appellant's] life. Therefore it was felt that it would be better if we separated the case and I presented the sentencing, as I might have more credibility than CPT [V], at that time, with the panel. I can say ... that CPT [V] and I were totally devoted to [appellant] and were determined to obtain an acquittal. There was no thought given to a possible conflict of interest with French after I was relieved from his case. The decision to cross-examine French had nothing to do with my prior representation and to the best of my knowledge was due solely to the fact that information to be obtained from cross-examination would have been detrimental to [appellant's] case.

In his affidavit, CPT V states that after counsel discovered appellant had confessed to French it was determined that CPT S would seek release from representing French. Appellant was informed of the possible conflict and admonished for not remaining silent as he had been advised. It was decided and appellant understood that CPT S would present the sentencing phase and that CPT V would conduct any necessary cross-examination of French. CPT V stated, "[appellant] indicated that he desired CPT [S] to continue as part of the defense team. [Appellant's] assertions in his affidavit that he was not informed concerning the conflict of interest are false." CPT V did not then and does not now believe that CPT S had a conflict of interest. He believes CPT S purged himself of the conflict by ceasing to represent French. He states that CPT S was never

8. These affidavits are admissible as extra-record matter on the issue of ineffective assistance of counsel. *See United States v. Davis*, 3 M.J. 430 (C.M.A.1977).

in a position to provide advice where there was a possible conflict and that the division of trial responsibilities did not require CPT S to use any possible client confidences. Consequently, he did not believe it was necessary to bring the matter to the attention of the military judge at trial. He did not cross-examine French as a matter of trial tactics. He could not see any advantage to be gained by cross-examination. He stated that CPT S's prior representation of French played no role in his decisions. In addition, the confession to French supported the theory of the defense that appellant was trying to protect Beate.

▮▮▮ After considering the affidavits, we find that the military judge had no reason to know, nor under the circumstances should he have known, that there was a possible conflict of interest. Therefore, he had no reason to inquire into the conflict of interest issue. In arriving at this finding, we have considered that, unlike most cases in which an issue of a conflict of interest arises, this case does not involve a co-accused. Although defense counsel had some obligation to inform the military judge, we understand their failure to do so because they thought any possible conflict had been purged and appellant had evidenced his desire to have CPT S continue to represent him. Under these circumstances, the presumption of a conflict of interest established in *Breese* does not apply. Appellant must show that an actual conflict of interest adversely affected his lawyer's performance. *See Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. He has failed to do so. We find most credible the affidavits of counsel that appellant was advised of the conflict, participated in counsel's actions in this matter, and desired to have CPT S continue to represent him. We also find as a matter of fact that trial defense counsel's decision not to cross-examine French was not related to any possible conflict of interest issue but was tactical. Even assuming that the presumption of conflict of interest of *Breese* applies, the reasons set forth in the affidavits establish a sufficient factual basis for us to find that the presumption was rebutted. *See Breese*, 11 M.J. at 23. Trial defense counsel's tactical decisions in this matter do not render their performance ineffective. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The assertion of error is without merit.

## IV. Other Claims of Ineffective Assistance of Counsel

Appellant further asserts a plethora of instances of ineffective assistance of counsel to include allegations that trial defense counsel were ineffective and appellate defense counsel are ineffective for various reasons.

The assertions of ineffective assistance of trial defense counsel that have not been discussed previously in this opinion relate to an alleged failure to conduct a proper background investigation of appellant and thus a failure to present mitigation and extenuation that would have resulted in a sentence of life imprisonment rather than death. We have examined the affidavits of trial defense counsel on this issue. Both counsel state that they relied on information and names of possible witnesses provided by appellant, contacted those witnesses, asked those witnesses for information and the names of other witnesses who might be helpful, and contacted those potential witnesses. CPT S stated:

> In preparing of [sic] the sentencing phase of the trial, I obtained a list of witnesses from [SGT Murphy] and also sent letters out to many friends and relatives in [Murphy's] home town. I was [sic] received responses to these letters and from these responses I made phone calls back to individuals inquiring into Murphy's life history. Based on these interviews, I selected the individuals I thought would be most helpful to our case and requested that they be flown over at government expense.

We have also examined the record of trial and note that on sentencing alone, seven witnesses from North Carolina testified for appellant. In addition, seven stipulations of expected testimony were read to the court. These witnesses were relatives and friends of appellant. Most of them were

from appellant's hometown and testified as to appellant's childhood and background. Also, Defense Exhibits C through V were admitted into evidence. This documentary evidence favorably addresses appellant's childhood background and good character.

■■■ To support an assertion of ineffective assistance of counsel, appellant must show that counsel was deficient and absent the deficiency there is a reasonable probability that the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott*, 24 M.J. 186 (C.M.A.1987). Even where a deficiency is found, the test is not solely a mere outcome determination but whether the result of the proceeding was fundamentally unfair or was unreliable. *Lockhart v. Fretwell*, — U.S. —, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Deference must be given to counsel's tactical judgment and we must not substitute our views with the benefit of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Bono*, 26 M.J. 240, 242 (C.M.A.1988).

In the case before us, we should not ignore trial defense counsel's tactical judgment. The test is not whether different counsel would have taken some other course of action, used a different method of preparation, or adopted a different form of investigation into appellant's background. Applying the *Strickland* test, we find no deficiency in trial defense counsel's performance. Even if we were to find a deficiency, we find the result of the proceeding fundamentally fair and reliable. Trial defense counsel were not ineffective.

■■■ Appellant also asserts that he has been denied effective assistance of counsel on appeal. He asserts that he was appointed three attorneys who lacked capital litigation experience and were not afforded the opportunity by this Court to become competent and prepare and present appellant's case. A related assertion, states that:

Appellant was denied his Fifth Amendment right to a fair adjudication of his case and his Sixth Amendment right to effective assistance of counsel at the appellate level when this Court denied appellant's motions to extend his case and hold the case in abeyance and forced his counsel to file less than competent and adequate pleading and refused to allow counsel to withdraw when this Court insisted that they compromise their responsibility [to] appellant and disobey their ethical obligations as attorneys.

First, we note that this is the second time this case has received appellate review before this Court. Over the five-year period that this case has been pending appellate review, appellant has had assigned at least nine defense appellate counsel. Although there have been several changes of assigned counsel, that can be expected when appellate review is prolonged. This Court has attempted to keep those changes to a minimum. Appellant has added to that turnover when he requested release of one of his most experienced counsel after this Court denied that counsel's motion to withdraw from representation of appellant because of his reassignment within the Washington, D.C., area. We do not believe appellant should now be heard to complain that his current counsel are less experienced.

In any event, in two prior death penalty cases, this Court has held that appellate counsel with similar experience as those who now represent appellant were qualified. *See United States v. Gray*, ACMR 8800807, 1992 WL 382309 (A.C.M.R. 15 Dec. 1992); *United States v. Loving*, 34 M.J. 1065 (A.C.M.R.1992); *United States v. Gray*, 32 M.J. 730, 733–736 (A.C.M.R.1991) (writ of mandamus denied). We again hold that counsel are qualified within the meaning of Articles 27 and 70, UCMJ, to represent appellant on appeal of a capital case.

■■■ We now address the assertion that this Court has not permitted enough time for counsel to present appellant's case, has refused to hold the case in abeyance and forced counsel to file less than competent and adequate pleadings, has refused to allow counsel to withdraw, and insisted they compromise their responsibility to appellant and disobey their ethical obligations. In addressing this assertion, we again note that this is the second time appellant has

received a review of his case. Many of the issues presented to this Court were decided in prior opinions on death penalty cases. Since this case was remanded to this Court, appellant has sought extraordinary relief before the United States Court of Military Appeals on three separate occasions.[9] This Court has issued over fourteen orders since the case has been returned for further review. Appellant has filed thirty-eight supplemental assignments of error following remand before this Court. Numerous extensions of time have been granted to appellant for the filing of his pleadings. Additionally, this Court has been liberal in permitting the filing of additional pleadings after the initial filing by appellant. Even though pleadings filed before this Court are usually limited to fifty pages, this Court has permitted appellant to file various pleadings consisting of more than 390 pages, in addition to appendices and appellate exhibits. A chronology of actions in this case concerning this issue is revealing and is attached as an Appendix. We note that time for filing pleadings may be limited, even in death penalty cases. *See Madden v. Texas*, 498 U.S. 1301, 111 S.Ct. 902, 112 L.Ed.2d 1026 (Scalia, Circuit Justice 1991).

After reviewing the actions of defense appellate counsel and the pleadings filed by them in this case, we find them competent, qualified, and not ineffective. We believe appellant has received due process of law.

### V. Cumulative Error

Appellant alleges that the cumulative effect of the numerous errors throughout the pretrial, trial, and post-trial proceedings deprived him of his right to due process.[10]

The doctrine of cumulative error is based upon the theory that several errors, none of which perhaps are sufficient to merit reversal, in combination necessitate reversal. *United States v. Banks*, 36 M.J. 150, 170 (C.M.A.1992); *United States v. Walters*, 4 U.S.C.M.A. 617, 635, 16 C.M.R. 191, 209 (1954); *United States v. Childress*, 33 M.J. 602, 606–7 (A.C.M.R.1991). In this case we have not found a number of errors that taken together require reversal. We find no cumulative error.

### VI. Proportionality Review and the Sentence

Finally, this case was returned to this Court to conduct a proportionality review required by the United States Court of Military Appeals. *See United States v. Curtis*, 32 M.J. 252, 271 (C.M.A.1991). We must determine whether the death sentence adjudged is proportionate to other death sentences that have been imposed. *Id.* We have considered generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes. *See United States v. Curtis*, 33 M.J. 101, 109 (C.M.A.1991). We have examined a number of cases and have concluded that the sentence is generally proportional to those imposed by other jurisdictions in similar situations.[11]

In accordance with *Curtis*, 32 M.J. at 271, we must determine:

(a) whether one or more valid aggravating factors have been unanimously found by the court-martial and this finding is factually and legally correct; (b) if

9. *Murphy v. Judges of the United States Army Court of Military Review*, 34 M.J. 310 (C.M.A. 1992) (scope of remand expanded); 37 M.J. 34 (C.M.A.1992) (petition denied); No. 93–8018/ AR, 1993 WL 217050 (C.M.A. 11 Mar. 1993) (petition denied).

10. Before this Court on 3 March 1993, defense appellate counsel orally argued assignments of error concerning jurisdiction, admissibility of appellant's statements, conflict of interest, cumulative error, and proportionality review. Counsel informed this Court that the only issue, standing alone, which counsel believed would

require reversal of the case was that involving conflict of interest of trial defense counsel. Counsel, however, contended that the combination of various errors asserted by appellant required reversal of the case.

11. We have examined over a hundred cases decided by the Supreme Court of the United States since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We have also examined *United States v. Gray*, ACMR 8800807, 1992 WL 382309 (A.C.M.R. 15 Dec. 1992), and *United States v. Loving*, 34 M.J. 956 (A.C.M.R. 1992).

any corrective action results in setting aside any such finding but leaves intact at least one 'aggravating factor' whether this error affected imposition of the sentence; (c) whether the death sentence adjudged is proportionate to other death sentences that have been imposed; and (d) whether under all of the facts and circumstances of the case the death sentence is appropriate....

Although three aggravating factors were found unanimously by the court-martial, in our prior opinion we found that the military judge did not properly instruct the members on one of those factors.[12] See *Murphy*, 30 M.J. at 1056–59. This Court found that even if one of the three aggravating factors was invalid we could affirm the death sentence based upon the remaining two factors. Those factors are that "The murder of Petra H. Murphy was preceded by the intentional infliction of substantial physical harm" and that there were multiple convictions of Article 118, UCMJ, in the same case. R.C.M. 1004(c)(7)(I) and (J). We find these remaining two factors factually and legally correct. The error concerning the one aggravating factor did not affect the imposition of the sentence. We have independently weighed the evidence and agree with each of the two remaining aggravating factors found by the court-martial. We find that each aggravating factor, standing alone, is sufficient to authorize the death penalty. We find the aggravating circumstances substantially outweigh the extenuating and mitigating circumstances. We hold that the death sentence is correct and appropriate.[13]

### VII. Other Assertions of Error

In addition to the assertions of error discussed in this opinion, appellant asserts numerous other errors. He has also appended to his brief before this Court a copy of his brief submitted to the United Court of Military Appeals on 10 June 1991, and incorporated by reference many arguments contained therein.

We have reviewed all of these assertions, and find them without merit. We find that appellant's constitutional and procedural challenges to the military justice system and capital punishment have been resolved adversely to him by prior decisions of the United States Court of Military Appeals. *See United States v. Weiss*, 36 M.J. 224 (C.M.A.1992); *United States v. Graf*, 35 M.J. 450 (C.M.A.1992); *United States v. Curtis*, 32 M.J. 252 and 33 M.J. 101 (C.M.A. 1991); *United States v. Matthews*, 16 M.J. 354 (C.M.A.1983). Other issues raised were addressed in Senior Judge Foreman's opinion in this case, which we adopt as dispositive of these issues. *Murphy*, 30 M.J. 1040. Concerning the issue of victim impact evidence, we would only add that this issue was rendered moot by *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), a decision subsequent to our earlier opinion in this case.

Lastly, the remaining assignments of error not addressed are also without merit.

For the reasons stated in this opinion and in this Court's opinion in *Murphy*, 30 M.J. 1040, the findings of guilty and the sentence are affirmed.

Chief Judge GRAY, Senior Judge NAUGHTON, Senior Judge CREAN, Judge BAKER, Judge GRAVELLE, Judge JOHNSTON, Judge WALCZAK, and Judge GONZALES concur.

Senior Judges JOHNSON, WERNER, and Judge DELL'ORTO did not participate in the decision of this case.

---

12. That factor was "The murder of Petra H. Murphy was preceded by the intentional infliction of 'prolonged substantial mental or physical pain and suffering to the victim'...." Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1004(c)(7)(I) [hereinafter R.C.M.].

13. Additionally, we specifically adopt the sentencing analysis of Senior Judge Foreman's opinion in this case. 30 M.J. at 1063.

APPENDIX

## United States v. Murphy: Appellate Chronology

| DATE | EVENT |
| --- | --- |
| 16 Nov to 17 Dec 1987 | Trial, United States v. Murphy. |
| 3 Mar 1988 | Action by Convening Authority. |
| 15 Mar 1988 | Referral of case to ACMR and designation of appellate counsel. |
| Apr 1988 | Appellant receives first extension of time to file Assignment of Errors with ACMR. |
| Late May 1988 | Appellant receives second extension of time until 5 August 1988 to file Assignment of Errors with ACMR. |
| 28 Jul 1988 | Appellant requests extension of time until 6 September 1988 to file Assignment of Errors with ACMR. |
| 5 Aug 1988 | ACMR grants appellant extension of time until 6 September 1988 to file Assignment of Errors. |
| 30 Aug 1988 | Appellant requests extension of time until 6 October 1988 to file Assignment of Errors with ACMR. |
| 31 Aug 1988 | ACMR grants appellant extension of time until 6 October 1988 to file Assignment of Errors. |
| Sep 1988 | Appellant requests extension of time until 6 November 1988 to file Assignment of Errors with ACMR. |
| 11 Oct 1988 | ACMR grants appellant extension of time until 6 November 1988 to file Assignment of Errors. |
| 7 Nov 1988 | Appellant requests extension of time until 15 November 1988 to file Assignment of Errors with ACMR. |
| 14 Nov 1988 | ACMR grants appellant extension of time until 15 November 1988 to file Assignment of Errors. |
| 15 Nov 1988 | Assignment of Errors filed with ACMR. |
| Dec 1989 | Government receives first extension of time until 13 February 1989 to file answer with ACMR. |
| 3 Feb 1989 | Government requests extension of time until 1 March 1989 to file answer with ACMR. |
| 7 Feb 1989 | ACMR grants government extension of time until 1 March 1989 to file answer. |
| 1 Mar 1989 | Answer to Assignment of Errors filed with ACMR. |
| 8 Mar 1989 | Appellant requests oral argument before ACMR. |
| 8 May 1989 | ACMR issues notice that it has decided, sua sponte, to consider appellant's case en banc. |
| 8 Jun 1989 | Appellant files Supplemental Assignment of Error with ACMR (voting procedure). |
| 10 Jul 1989 | Government Answer to Supplemental Assignment of Error filed with ACMR. |

| DATE | EVENT |
|---|---|
| 16 Mar 1990 | ACMR schedules oral argument in appellant's case for 10 April 1990. |
| 10 Apr 1990 | Oral Argument before ACMR, en banc. |
| 25 May 1990 | Original ACMR opinion issued, United States v. Murphy, 30 M.J. 1040 (A.C.M.R.1990). |
| 14 Jun 1990 | Appellant's case filed at CMA as mandatory review case. 31 M.J. 426. |
| 6 Aug 1990 | Appellant requests extension of time until 12 September 1990 to file brief. |
| 7 Aug 1990 | CMA grants appellant extension of time until 12 September 1990 to file brief. 31 M.J. 484. |
| 6 Sep 1990 | Appellant requests extension of time until 12 October 1990 to file brief. |
| 12 Sep 1990 | CMA grants appellant extension of time until 12 October 1990 to file brief. 32 M.J. 26. |
| 5 Oct 1990 | Appellant requests extension of time until 11 November 1990 to file brief. |
| 10 Oct 1990 | CMA grants appellant extension of time until 13 November 1990 to file brief. 32 M.J. 194. |
| 6 Nov 1990 | Appellant requests extension of time until 13 December 1990 to file brief. |
| 8 Nov 1990 | CMA grants appellant extension of time until 13 December 1990 to file brief. 32 M.J. 211. |
| 6 Dec 1990 | Appellant requests extension of time until 13 January 1991 to file brief. |
| 10 Dec 1990 | CMA grants appellant extension of time until 13 January 1991 to file brief. 32 M.J. 237. |
| 7 Jan 1991 | Appellant requests extension of time until 14 February 1991 to file brief. |
| 14 Jan 1991 | CMA grants appellant extension of time until 13 February 1991 to file brief. 32 M.J. 310. |
| 6 Feb 1991 | Appellant requests extension of time until 15 March 1991 to file brief. |
| 19 Feb 1991 | CMA grants appellant extension of time until 15 March 1991 to file brief. 32 M.J. 382. |
| 6 Mar 1991 | Appellant requests extension of time until 15 April 1991 to file brief. |
| 7 Mar 1991 | CMA grants appellant extension of time until 15 April 1991 to file brief. 32 M.J. 465. |
| 15 Apr 1991 | Appellant requests extension of time until 15 May 1991 to file brief. |
| 17 Apr 1991 | CMA grants appellant extension of time until 15 May 1991 to file brief. 32 M.J. 491. |

| DATE | EVENT |
|---|---|
| 25 Apr 1991 | CMA admits defense appellate exhibits relating to sanity board,; denies request to direct sanity board; directs counsel to file other documents pertaining to sanity boards.  33 M.J. 3. |
| 15 May 1991 | Appellant submits brief to CMA. |
| 28 May 1991 | CMA grants appellant's motion to file brief in excess of fifty pages. 33 M.J. 173. |
| 6 Jun 1991 | CMA grants joint motion to extend time to respond to 25 April 1991 court order.  33 M.J. 183. |
| 10 Jun 1991 | Appellant submits corrected brief to CMA. |
| 25 Jun 1991 | CMA grants appellant's motion to file corrected brief.  33 M.J. 194. |
| 3 Jul 1991 | Government requests extension of time until 10 August 1991 to file answer with CMA. |
| 10 Jul 1991 | CMA grants joint motion to extend time until 29 July 1991 for counsel to respond to 25 April 1991 court order.  33 M.J. 482. |
| 11 Jul 1991 | CMA grants extension of time until 12 August 1991 for government to file answer.  33 M.J. 487. |
| 29 Jul 1991 | Appellate Defense and Government Counsel submit CMA-ordered documents related to sanity boards. |
| 9 Aug 1991 | Government requests extension of time until 9 September 1991 to file answer with CMA. |
| 28 Aug 1991 | CMA grants extension of time until 9 September 1991 for government to file answer.  34 M.J. 25. |
| 4 Sep 1991 | Government requests extension of time until 9 October 1991 to file answer with CMA. |
| 12 Sep 1991 | CMA grants extension of time until 30 September 1991 for government to file answer.  34 M.J. 58. |
| 27 Sep 1991 | Government requests extension of time until 30 October 1991 to file answer with CMA. |
| 3 Oct 1991 | CMA grants extension of time until 15 October 1991 for government to file answer.  34 M.J. 157. |
| 15 Oct 1991 | Government requests extension of time until 4 November 1991 to file answer with CMA. |
| 28 Oct 1991 | CMA grants extension of time until 28 October 1991 for government to file answer.  34 M.J. 169. |
| 7 Nov 1991 | Government submits CMA Answer to Final Brief; moves for extension of time to file brief until 7 November 1991; moves to submit brief in excess of fifty pages. |
| 12 Nov 1991 | CMA grants government's 7 November 1991 motion.  35 M.J. 169. |
| 25 Mar 1991 | CMA orders status call in appellant's case for 10 April 1992.  36 M.J. 257. |
| 10 Apr 1992 | CMA holds "status call" in appellant's case. |
| 14 Apr 1992 | CMA remands appellant's case to ACMR.  36 M.J. 8. |

| DATE | EVENT |
|---|---|
| 17 Apr 1992 | Referral to ACMR by Office of The Judge Advocate General; previous designations of counsel remain in effect. |
| 20 Apr 1992 | ACMR orders appellant to file any desired pleadings within thirty days. |
| 28 Apr 1992 | ACMR adopts CMA suggestion to consider appellant's case en banc on remand. |
| 13 May 1992 | "New" appellate defense counsel (CPT Swope, CPT Turney, CPT Mayer) assume responsibility for case and request an extension of time until 19 July 1992 to file pleadings. |
| 14 May 1992 | ACMR orders Defense Appellate Division to justify change in counsel and delay in processing; filing time for pleadings extended to 30 May 1992. |
| 18 May 1992 | Chief, Defense Appellate Division, files response to ACMR order, explaining case management procedures and change of counsel. |
| 21 May 1992 | CPT Moran ordered to continue to represent appellant. |
| 22 May 1992 | Appellate Defense Counsel (CPT Moran, CPT Mayer, CPT Turney) request extension of time to file pleadings at ACMR until 29 June 1992. |
| 26 May 1992 | ACMR grants extension of time for appellant to file pleadings until 9 June 1992. |
| 5 Jun 1992 | Appellant files petition for writ of mandamus and prohibition with CMA. 36 M.J. 50. |
| 9 Jun 1992 | Appellate defense counsel (CPT Moran) files brief on proportionality review. |
| 19 Jun 1992 | CMA expands scope of remand to include "any issues not previously considered by the court." Murphy v. Judges of U.S. Army Court of Military Review, 34 M.J. 310 (C.M.A.1992). |
| 23 Jun 1992 | ACMR orders "omnibus" supplemental brief filed no later than 23 July 1992. |
| 2 Jul 1992 | Appellate Defense Counsel (CPT Moran) requests to withdraw as counsel, pursuant, inter alia, to appellant's affidavit that he no longer desires to be represented by CPT Moran. |
| 2 Jul 1992 | Affidavit by appellant detailing desire to release CPT Moran submitted to ACMR. |
| 10 Jul 1992 | Pursuant to appellant's affidavit, ACMR grants CPT Moran's request to withdraw as counsel. |
| 16 Jul 1992 | Appellate Defense Counsel (CPT Swope, CPT Turney, CPT Mayer) enter appearance [sic] and request ninety-day extension to file pleadings. |
| 5 Aug 1992 | ACMR extends time for appellant to file supplemental brief until 3 Sep 1992. |
| 19 Aug 1992 | Appellant requests 90 to 120–day extension of time to file supplemental assignment of errors. |
| 26 Aug 1992 | ACMR grants final extension to file supplemental pleading until 2 Nov 1992. |

| DATE | EVENT |
|---|---|
| 17 Sep 1992 | Based upon <u>ex parte</u> submissions by appellant and a nonexistent ACMR opinion, Office of The Judge Advocate General allocates $15,000 in funding for mitigation expert for appellant. |
| 24 Sep 1992 | Appellant files motion with ACMR to hold case in abeyance pending outcome of investigation by mitigation expert. |
| 5 Oct 1992 | ACMR denies appellant's motion to hold case in abeyance pending report of mitigation expert. |
| 22 Oct 1992 | Appellant files petition and supporting brief with CMA, seeking writ of mandamus, asking CMA to abate proceedings at ACMR until mitigation expert has completed her report. |
| 23 Oct 1992 | Appellate defense counsel, CPT Swope, CPT Turney, and CPT Mayer notify ACMR of intent to withdraw from representation of appellant. |
| 28 Oct 1992 | ACMR grants CPT Mayer's withdrawal (upon filing of brief) because of his release from active duty; orders other counsel to continue to represent appellant. |
| 28 Oct 1992 | CMA denies appellant's petition for extraordinary relief in the nature of a writ of mandamus against ACMR. |
| 28 Oct 1992 | Appellant moves to file brief with ACMR in excess of fifty pages; motion granted by ACMR. |
| 2 Nov 1992 | Supplemental Brief on Behalf of Appellant filed with ACMR; Appellant files motion to admit Defense Appellate Exhibits A through Z. |
| 24 Nov 1992 | Government moves for first extension of time until 2 January 1993 to file response to appellant's supplemental brief with ACMR. |
| 4 Dec 1992 | ACMR grants Government extension request; orders brief filed 4 January 1993. |
| 28 Dec 1992 | Government requests second extension of time until 2 February 1993 to file response to appellant's supplemental brief. |
| 5 Jan 1993 | ACMR grants Government final extension until 2 February 1993. |
| 25 Jan 1993 | Appellant moves to file with ACMR brief in excess of fifty pages on issues headnoted but not briefed in appellant's supplemental assignment of errors. |
| 29 Jan 1993 | Government requests ACMR to take judicial notice of record in <u>United States v. French</u>. |
| 29 Jan 1993 | Appellant files with ACMR brief on issues headnoted but not briefed in appellant's supplemental assignment of errors. |
| 1 Feb 1993 | Government moves for admission before ACMR of Government Appellate Exhibits 1 through 6; moves for more definite statement regarding an assignment of error by appellant. |
| 2 Feb 1993 | Government files with ACMR answer to appellant's supplemental assignment of errors. |
| 3 Feb 1993 | ACMR grants Government request for brief in excess of fifty pages; takes judicial notice of Record of Trial in <u>French</u>. |

1154

| DATE | EVENT |
|---|---|
| 3 Feb 1993 | ACMR grants appellant's motion to file brief on "headnote" issues; ACMR sua sponte orders oral argument in appellant's case for 3 March 1993. |
| 5 Feb 1993 | ACMR denies Government request for more definite statement; admits Defense Appellate Exhibits A–Z; admits Government Appellate Exhibits 1–6; grants Government request to file table of authorities. |
| 12 Feb 1993 | Appellant moves to postpone oral argument before ACMR until mid-May 1993. |
| 18 Feb 1993 | ACMR denies appellant's request to postpone oral argument. |
| 23 Feb 1993 | Appellant again files writ at CMA seeking abatement of proceedings at ACMR until the mitigation expert completes her report. |
| 23 Feb 1993 | Appellant requests extended (one hour per side) oral argument by two appellate defense counsel at ACMR. |
| 1 Mar 1993 | ACMR grants appellant's motion for extended time (one hour per side) oral argument and argument by two appellate defense counsel. |
| 2 Mar 1993 | Appellant moves to modify assignment of error pertaining to proportionality review. |
| 3 Mar 1993 | ACMR grants appellant's motion to modify assignment of error pertaining to proportionality review. |
| 3 Mar 1992 | Oral argument before ACMR on remand. |
| 11 Mar 1993 | CMA denies appellant's writ petition and application for abeyance. |

